# 𝔕𝔦𝔠𝔥𝔪𝔬𝔫𝔡

## S. D. MAY, STATE HIGHWAY COMMISSIONER OF VIRGINIA v. BERNARD W. DEWEY, ET AL.

March 7, 1960.

Record No. 5048.

Present, All the Justices.

The opinion states the case.

*Francis C. Lee,* Assistant Attorney General (*A. S. Harrison, Jr., Attorney General; M. Ray Johnston,* Assistant Attorney General; *Jesse, Phillips, Klinge & Kendrick,* on brief), for the appellant.

*James H. Simmonds,* for the appellees.

MILLER, J., delivered the opinion of the court.

This is a condemnation proceeding brought by S. D. May, State Highway Commissioner, hereinafter at times called condemner, which involves acquisition of a parcel of land along the south edge of Lee highway, a short distance west of its intersection with the western line of Glebe road, for the purpose of improving and widening Lee highway.

In Arlington county at the area condemned Lee highway is the same as routes 29 and 211; it was formerly known as Fairfax and Georgetown road; Glebe road is the same as route 120, and was formerly known as the Chain Bridge and Alexandria road.

We granted an appeal to condemner from a final order of Decem-

ber 29, 1958, that overruled exceptions to the commissioners' report and directed payment into court of an award to Bernard W. Dewey of $24,259.25 as compensation and damages. The order also allowed interested at 5 per cent per annum on a portion of the award from October 7, 1955, until paid into court.

By an order of December 2, 1958, the court had determined that Dewey owned a strip of land that condemner contends had been dedicated to the public, and the land for which compensation and damages were awarded included that disputed area.

Numerous errors were assigned by condemner, but those now relied upon may be stated as follows:

The court erred (1) when it failed to hold that the public had acquired a part of the land condemned by dedication prior to 1957;

(2) By allowing tenants of the landowner to intervene as parties, testify to the value of their leasehold and participate in the proceeding;

(3) By allowing the landowner and his tenants to introduce evidence on the going value of the businesses conducted by them on the land taken and the remaining land;

(4) By allowing the landowner to introduce evidence of comparable sales in the vicinity made long after the taking and after the highway improvement project had been completed;

(5) By permitting the landowner to introduce evidence of the consideration paid for land by the State Highway Commissioner to a neighboring landowner two years after the time of the taking and in settlement of a pending condemnation suit incident to the same highway improvement project;

(6) By ordering condemner to pay interest on a portion of the award.

To aid the reader to visualize the parcel of land acquired to widen Lee highway and to show the shape, dimensions and location of the parcel in dispute, i.e., the hatched strip, a diagram of the area, not drawn to scale, appears below:

The first problem presented is whether or not the disputed area shown by the hatched lines belonged to Dewey or had been dedicated by a former owner to the public prior to 1957.

On October 7, 1955, pursuant to then §§ 33-70 and 33-74, Code 1950, condemner filed with the clerk of the circuit court certificate of deposit No. 5599 describing the land of Bernard W. Dewey sought to be condemned. The land that the condemner then attempted to acquire to improve and widen Lee highway included all of the area shown on the diagram between the letters FVRMF, except the

624

Glebe Road

LEE HIGHWAY

15' Alley

Diagram "X"

N

hatched strip within the letters FEHDF. It is this hatched area which is 10 feet deep by 185 feet long that condemner claims had been dedicated to the public and for which no compensation should have been allowed.

On December 12, 1956, Dewey filed a petition in the cause pursuant to chapter 565, Acts 1956 (amendment to Code section 33-70), and prayed for the withdrawal of 90 per cent of the funds represented by the certificate of deposit. Condemner moved to dismiss this petition on the ground that the amended statute did not apply to a certificate of deposit filed before the amended statute's effective date since that certificate did not vest title in the Commonwealth. By agreement condemner subsequently withdrew certificate No. 5599, and on April 17, 1957, recorded new certificate A651, which represented the same sum that had theretofore been deposited and described the same land. It was filed pursuant to the then effective provisions of §§ 33-70 and 33-74 and had the effect of then vesting title in the Commonwealth to the lands described in the original certificate. The court entered an order reciting what had been done and ordered payment of 90 per cent of the sum represented by new certificate A651 to Dewey, and payment was duly made.

On June 5, 1957, Dewey and wife filed a petition under § 33-75, Code 1950, reciting that they owned the land described in their petition, that in March, 1956, condemner had entered upon the land and damaged the residue, and that no agreement had been reached as to compensation. They prayed for appointment of commissioners to ascertain compensation and damages. This petition described a strip of land on the south side of Lee highway of uniform depth of 19.85 feet and a length of 242.5 feet which was larger by 1,850 square feet than the area described by condemner in the certificate of deposit. These additional 1,850 square feet constitute the hatched strip on the diagram and the difference in the amount of land described in the Dewey petition and that originally sought to be taken by the condemner is because the plats attached to the certificate of deposit do not include the hatched strip. The plats filed with condemner's certificates of deposit indicated that the hatched area protruded about 10 feet beyond Dewey's property line (line HE) and was within the existing right-of-way of Lee highway.

Condemner filed an answer to Dewey's petition, which contained the allegations and prayer ordinarily embodied in an original petition for condemnation but disputed the area of land that Dewey alleged was being taken. By agreement the evidence was heard *ore tenus* by

the court to determine the amount of land actually being taken by condemner. Dewey contended that he had acquired the hatched strip by adverse possession or through a deed obtained from the former record owner, John Scott, *pendente lite,* dated August 22, 1957, and recorded on that date. Condemner contended that title to that area was already vested in the Commonwealth through implied dedication to public use by John Scott, which had been long acquiesced in by Dewey and wife.

Condemner offered exhibits in evidence which showed that in 1924 John Scott and wife acquired 8.646 acres at the southwest corner of Lee highway and Glebe road (route 120). This tract appears on the diagram within the lines connecting letters ABCDA. At this time the parcel immediately to the west within lines DCNMD was owned by Virginia White, and the northerly line of both parcels was recited to be the south line of Lee highway. On December 31, 1929, John Scott and wife conveyed a parcel of land approximately 10 feet wide to the Commonwealth of Virginia extending 200 feet along the southern line of Lee highway and along the entire frontage of Scott's land on Glebe road. This strip widened Lee highway on its south and Glebe road on its west and is contained within the lines connecting ABPQEFA. The metes and bounds in this deed designate a line represented by EQ as "the new south line of Lee Highway as the same is hereby established," and elsewhere in the deed that line is designated as the "south widened line of Lee Highway." Following the description is this recital: "The above conveyance is made for the purpose of dedicating the above strip of land as, and shall be used only for, public highway purposes."

On the following day John Scott and wife conveyed to Mervin A. Mace the area within lines connecting QPGEQ. This deed contains metes and bounds which refer to line EQ as "the south widened line of Lee Highway * * * a line which is 10 feet south of the southern line of the original Fairfax and Georgetown road by following along the south widened line of said Lee Highway." The description also located the new road lines with reference to mentioned highway monuments. On January 3, 1938, John Scott and wife conveyed to Bernard W. Dewey land within lines connecting EGCHE, and the boundary description refers to line HE as "the south line of Lee Highway." After the description, the deed states that the conveyance is "Also subject to any conveyance to Commonwealth of Virginia for highway purposes". No mention is made of the disputed 10-foot strip—FEHDF—though it had been included in Scott's

original acquisition. By deed of May 5, 1942, Dewey acquired from Virginia White the adjoining tract on the west which appears as DCNMD. The description of this area mentions a plat attached to a decree in an old chancery suit which refers only to the old "south side of the Fairfax and Georgetown Pike," now indicated by line MD. By these conveyances Dewey became the owner of record of the tract of land shown on the diagram within lines connecting EGNMDHE. After acquisition of this acreage Dewey and wife executed a number of trust deeds that encumbered various parts of the tract, some of which have been released of record while some have not. They have the effect of dividing the tract by metes and bounds as described below.

The first two deeds encumber the area within letters EGIJE, and each refers to line JE as "the new south line of Lee Highway." Two other deeds encumbered the area within letters JIKLJ, and these deeds, to which plats were attached, refer to line LJ as the "south line of Lee Highway as now used." The part of the tract within letters LKNOL was encumbered by Dewey and wife by two deeds in which no mention was made of the area DHOMD though Dewey acquired record title to that and part of the encumbered land from Virginia White. A plat was referred to in one of these deeds, and the description in both refer to line OL as the "south line of Lee Highway."

In 1938 Dewey constructed a two-story building on the easterly part of his property, rented out office apartments on the upper story and occupied the ground floor for the purpose of operating a retail and wholesale hardware supply business. In 1939 he constructed a one-story building on the westerly part of his property which he leased to Bayard Evans and wife who have operated a restaurant business there until the present time. The area west of the restaurant and to the north of both buildings between those structures and the traveled part of Lee highway was paved by Dewey; merchants occupying the Mace tract to the east also paved the area to the north of their buildings, and the paved area was used for a parking lot for customers of the restaurant, and stores owned by Dewey and his neighbors to the east. The disputed hatched strip was occupied almost entirely by this parking area and by an entrance from the highway through which customers entered the shopping area.

The part of Lee highway which was situated immediately north of the hatched area consisted, prior to the taking, of a 40-foot right-of-way upon which was constructed a 30-foot pavement. It

accommodated three lanes of congested traffic, and there were sidewalks along the store fronts on the owner's property but none on the right-of-way. There was neither curb nor gutter adjacent to the property and pedestrians walked on the traveled part of the highway to approach the stores from east to west. As a result of this project the highway was widened to accommodate five lanes of traffic and the traffic congestion which had existed at the intersection of Lee highway and Glebe road was relieved and the flow of traffic increased.

Five or six years after Dewey acquired his land from Scott, road officials of the state or county erected a row of white painted posts within the disputed area to divide the parking lot from the traveled portion of the highway. This row of posts was situate just south of line DF and was maintained until the State Highway Department occupied the entire area in March, 1956. In March, 1956, more than a year prior to institution of this proceeding, the State Highway Commissioner entered upon the disputed 10-foot strip, constructed new pavement, curb, gutter and sidewalk thereon. However, Dewey testified that he thought he owned the hatched area when he paved it and was aware of no claim to it by the State Highway Department until 1955. On the 22d day of January, 1957, after issue had been joined on the question of ownership of this strip of land, Dewey secured a deed from John Scott in which the latter undertook to convey to Dewey "all of his right, title, interest and claim" in and to the disputed area for which Dewey paid Scott $50.

Upon determining that there had been no dedication of the hatched strip and that Dewey owned that area, the court said:

"On the whole evidence, it seems to me that the state is assuming the position of converting what could well be under the circumstances and appears to me to be a secret and undisclosed intention on the part of Scott at some time in the future to possibly dedicate, but that this intention has never ripened under the circumstances into such a definite offer that it could be accepted by the state.

"The use by Dewey has been not for the purposes of a highway but for his own private purposes, for parking, and of course use by the public under those circumstances is not a user of the highway.

"The Court has concluded that under the circumstances title remains in Dewey."

Inquiry was made of the court as to whether its finding was "as a result of adverse possession or by the deed from Scott," and the court replied, "by deed from Scott," meaning the deed from Scott to Dewey of August 22, 1957, mentioned in the order of December 2, 1957.

Dedication is a form of transfer by an owner to the public of the fee or a lesser interest in land. Intent to dedicate is the vital factor, and the dedication may be express or implied, and be accomplished by any means through which an intent to dedicate is made manifest, but it is not effectual until accepted.

"No special form or ceremony is required for a dedication, and the statute of Frauds, or in Virginia the statute of Conveyances, is not applicable thereto, so that neither deed nor writing is necessary to the validity of a dedication to public uses, the only essential, so far as the grantor is concerned, being clear and unequivocal evidence of an *intention to dedicate*." 2 Minor, *Real Property*, 2d ed., § 1259, p. 1697.

"* * * [I]f the public authorities treat a road as a public highway, a comparatively short time will warrant a presumption of dedication on the part of the owner." 1 Minor's *Institutes*, 2d ed., p. 120.

It is well recognized that the intention to dedicate may be evidenced by statements or recitals in a deed from one owner to another to which the dedicatee is not a party. *Bellenot* v. *City of Richmond*, 108 Va. 314, 61 S. E. 785; *Harper's Ferry* v. *Kaplon & Bro.*, 58 W. Va. 482, 52 S. E. 492.

In *Buntin* v. *City of Danville*, 93 Va. 200, 204, 24 S. E. 830, it is said:

"* * * Dedication is an appropriation of land by its owner for the public use. It may be express or implied. It may be implied from long use by the public of the land claimed to have been dedicated. * * *"

Of like import is *Harris* v. *Commonwealth*, 20 Gratt. (61 Va.) 833.

It is not contended that Scott made an express dedication of the 10 by 185 foot strip, nor has there been such long continued use of the area by the public from which dedication must be implied. There is but little evidence to indicate that the public authorities considered the conveyance by Scott to Dewey of January 3, 1938, which granted the land within letters EGCHE and contained the provision "also subject to any conveyance to Commonwealth of Virginia for highway purposes" as constituting an implied dedication of the hatched strip which was outside the area conveyed to Dewey. In fact some of the events subsequent to execution of that deed tend to negate intent on the part of Scott to dedicate or belief on the part of public authorities that dedication was implied, for Dewey paved the area and used it as a parking space, and no attempt by public officials to assert rights therein was made evident until the year 1956.

The fact that conveyances by Dewey described the south line of the hatched area as the line of the new highway is not binding upon

Scott, and from that circumstance an intention by Scott to dedicate may not be implied. Scott's conveyance of the area to Dewey by deed of January 22, 1957, tends to negative any intent on Scott's part to have previously dedicated the land to public use, by deed or otherwise.

The evidence, documentary and oral, was considered by the trial judge when all matters of law and fact were submitted to him for determination of the issue as to ownership of the disputed area. When this evidence is carefully scrutinized and applicable principles of law adhered to, it is sufficient to sustain the court's finding that there has been no dedication of the area, express or implied, by John Scott, and that Dewey acquired the land under the deed of January 22, 1957.

On April 8, 1958, Bayard D. Evans and Ruth N. Evans, his wife, lessees of the restaurant building and premises, filed an intervening petition which recited that they had a leasehold interest in part of the land taken, that the residue of their leasehold would be damaged by the taking, prayed that their rights be passed upon by the commissioners and damages ascertained and allowed them pursuant to § 25-42, Code 1950. Condemner's motion to strike the petition was overruled, and Evans and wife were allowed to intervene; their right to the additional relief prayed was reserved until the hearing before the commissioners.

On July 21, 1958, the commissioners met and were conducted upon a view of the property described in Dewey's petition, but as Evans and wife claimed a leasehold interest in part, the commissioners were directed to make separate awards for the two parcels. Parcel 1 was described as that on which Dewey maintained a hardware store, and Parcel 2 was the area leased to Evans for a restaurant.

Carroll Wright, a witness for condemner, testified to the value of the land taken and damage to the residue, and in doing so, stated that the lease upon the restaurant provided for a $9,000 a year minimum and $13,200 maximum rent, which was based on an agreed percentage of gross sales and the rent had averaged about $12,000 a year. Evans was then permitted, over objection of condemner, to testify to the gross sales of the restaurant business for several years prior to the taking and for the period of one year after the taking, for the purpose of showing the lessened value of the property by a comparison of the gross sales before and after the taking.

Evans' individual counsel was also permitted to make an opening statement, cross-examine all witnesses, and argue the case. Dewey was allowed over condemner's objection to testify to the gross receipts

received by him for the years 1953 to 1958, inclusive, from the hardware business he conducted.

After having heard the evidence and considered the court's instructions and arguments of counsel, the commissioners made the following awards:

Parcel 1

Compensation for land taken ...................... $4,861.50
Damages to residue ........................... 3,000.00

Parcel 2

Compensation for land taken .................... $11,397.75
Damages to residue ........................... 5,000.00

Upon return of the report, condemner filed exceptions, which were overruled. The order confirming the report held that the disputed area should be considered to have been condemned, and ordered title thereto vested in the Commonwealth at the time of ultimate payment of the award. It also directed payment of the award in excess of the amount paid to Dewey pursuant to order of April 27, 1957, to be deposited with the clerk with interest upon the difference between the amount of the original certificate No. 5599 and the total award, at 5 per cent per annum from October 7, 1955, (the date certificate No. 5599 was filed) until the date of payment to the clerk. The order reserved for further determination the rights of the parties to share in the award, and the rights of the claimants to interest subsequent to the date of payment to the clerk. The sum required to be paid to the clerk was paid by condemner on January 7, 1959.

Section 33-60, Code 1950, regarding the institution of highway condemnation proceedings under which this action was brought directs that the State Highway Commissioner, upon filing his petition, "shall give ten days' notice either to the tenants or to the tenants of the freehold, or to the owner * * *" and the last sentence of the section provides as follows: "Such notice shall be served on the tenant of the freehold, his guardian or committee or upon the owner or owners thereof."

It thus appears that a tenant for years is not a necessary party.

Section 25-26, Code 1950, provides that after payment of the compensation and damages into court, the court shall distribute the money "as to it may seem right, having due regard to the interest of all persons therein, whether such interest be vested, contingent or otherwise * * *."

In *Stanpark Realty Corp.* v. *City of Norfolk*, 199 Va. 716, 101 S. E. 2d 527, Stanpark conducted a parking business on a lot that it owned and on one leased from Pender Holding Corporation, and Stanpark was made a party to the original condemnation proceeding, but that was required because Stanpark was an owner of a part of the land condemned. As a fee owner, it was entitled to appear before the commissioners but the court rightly prevented Stanpark from introducing evidence of damage to its leasehold interest, and also rightly held that Stanpark, as lessee, was not entitled to offer evidence regarding its income and profits from the property that it leased. In affirming these rulings, we said:

"Stanpark next contends that it was entitled to show special damages suffered by reason of the termination of its leasehold on the Pender property as well as damages to its remaining property owned in fee and operated as a parking facility. The court sustained the objection of the city as to the evidence regarding Stanpark's income and profits from the property leased from Pender but permitted Stanpark to show the income from its parking facilities on the property which it owned in fee, and admitted testimony regarding the leasehold by Stanpark with Pender, showing the terms of the lease and the rental paid Pender therefor. The court's ruling in this instance was that the value of the lease was admissible for the purpose of showing the value of the Pender property, and that any income or profit Stanpark might make on the property leased from Pender was not material evidence. In this connection the court relied upon the rule laid down in *Richmond, etc., R. Co.* v. *Chamblin*, 100 Va. 401, 406, 41 S. E. 750, as follows:

" 'It seems to be well established that damages to the trade or business of the landowner are generally too remote to be a subject of damages, because they depend upon contingencies too uncertain and speculative to be allowed.' " (At page 723)

     \*      \*      \*      \*      \*      \*      \*

"In this instance the commissioners had before them evidence showing the fee simple value of the Pender property and in addition they had before them Pender's lease with Stanpark showing the monthly and yearly rental thereon. In making the award to Pender they took this into consideration and fixed the sum of $35,345 as the value of the property taken, and $16,348 damages to the residue. From this award the court or the special commissioner appointed by the court in another proceeding should fix the value of Stanpark's

lease on this property and deduct the same therefrom. This procedure is sanctioned by § 25-26 of the Code which provides that after the payment of compensation and damages into court the interest of anyone in the property shall terminate, and such interest shall be transferred to the funds paid into court. * * *" (At page 725.)

To make separate awards for the two parcels of land was correct because one was subject to Evans' lease. Yet the tenant should not have been permitted to participate in the trial; his rights in the award of compensation and damages should be asserted and established as provided for in § 25-26. Nor should the gross receipts of the tenant or the owner in the businesses conducted by them upon the two parcels of land have been admitted in evidence before the commissioner in the condemnation proceeding.

Evidence of the rent paid by the tenant to Dewey was admissible as tending to prove the value of the land, but testimony as to the gross sales or to the percentage thereof from which the rent was computed should not have been admitted. Profits and losses from the businesses are too speculative and uncertain to be considered in assessing compensation for land taken or damage to the residue. Lewis, *Eminent Domain*, § 487; *Fonticello Mineral Springs Co.* v. *Richmond*, 147 Va. 355, 137 S. E. 458; *Ryan* v. *Davis*, 201 Va. 79, 109 S. E. 2d 409.

It was agreed that the time of the taking was August 20, 1956, and in proving the value of the land taken and the enhancement in value of the owner's remaining lands by reason of the improvement, condemner introduced evidence of the amount derived from sales of commercial property in the vicinity at and prior to the taking. After introduction of that evidence, the court allowed the landowners, through cross-examination and over condemner's objection, to introduce evidence of sales of commercial properties in the area in 1958, which was about two years after completion of the project when the traffic had materially increased on Lee highway.

Years ago this court adopted the rule that evidence of "comparable sales", to be admissible, must be of sales made under comparable conditions in point of time and circumstances. *Seaboard Air Line Railway* v. *Chamblin*, 108 Va. 42, 60 S. E. 727, 118 A. L. R. 869; *Virginia Electric & Power Co.* v. *Pickett*, 197 Va. 269, 89 S. E. 2d 76. 18 Am. Jur., Eminent Domain, § 351, p. 994. The admission of evidence of sales after the taking and after the project had been completed and conditions materially changed did not reflect a fair market value of the property when taken. Yet its admission very probably

gave the commissioners the impression that the subsequent sales were comparable to the value of the owners' land at the time of the taking. Its admission was prejudicial to condemner.

Over condemner's objection the court permitted a witness offered by the landowner to state the price paid by the Commonwealth for land to a neighboring owner two years after the taking and in settlement of a pending condemnation suit incident to the same project. Usually transactions between an owner of land that is about to be taken and the condemner fail to meet the tests of "comparable sales." Neither the purchaser nor the seller is then acting as a free agent for the price paid is usually influenced to a degree by compromise or compulsion because of the pending litigation. Before admitting such evidence the party offering it should show that the sale was not by way of compromise but was voluntary and without compulsion. Here no such proof was offered, and the admission of this evidence was error. *Collins* v. *Pulaski*, 201 Va. 164, 110 S. E. 2d 184; *Seaboard Air Line Railway* v. *Chamblin, supra;* 5 Nichols, *Eminent Domain*, 3d. ed., § 21.33; 18 Am. Jur., Eminent Domain, § 352, p. 996.

■ Prior to 1956 there was no provision for fixing interest on awards or any portion thereof except interest that was allowed on awards after they became final. Section 25-24, Code 1950. *Virginia Electric & Power Co.* v. *Call*, 195 Va. 454, 78 S. E. 2d 670. However, now provision for the allowance of interest to the landowner has been somewhat liberalized by amendment of § 33-70, Code 1950, by Acts 1956, ch. 565, p. 928, and by Acts 1958, ch. 581[1], at p. 878 (§ 33-70.10, 1958 Cum. Supp., Code 1950), and we must determine under which one of these Acts interest should have been allowed to the landowner.

The court allowed interest at five per cent on the excess over the amount of deposit from the 7th day of October, 1955, (the date of the filing of the original certificate) until payment to the clerk. As the final order is to be reversed and the award set aside, the allowance of interest on any part of this particular award has become moot. Yet the next award might also exceed the sum represented by the certificates of deposit, and it is advisable that we determine the time from which interest should be allowable in that event.

When the first certificate No. 5599 was filed on the 7th day of October, 1955, the then effective statutes, §§ 33-70 and 33-74, did not vest title in the Commonwealth upon the filing of a certificate of

---

[1] Acts 1958, ch. 581, p. 875, repealed §§ 33-70 and 33-74, and added §§ 33-70.1 through 33-70.11 to the 1950 Code.

deposit. However, when the new certificate No. A651 was filed on the 17th day of April, 1957, the statute had been amended by Acts 1956, and § 33-70, as amended, then provided that upon filing the certificate, title to the land condemned should be vested in the Commonwealth. The amended statute also expressly provided that "In the event of an award in a condemnation proceeding being of a greater amount than that deposited pursuant to this section, the excess amount, together with interest accrued on such excess at the rate of five per centum per annum from the *date of such deposit to the date of the award,* shall be paid to the person or persons entitled thereto. In no other instance shall interest be allowed on any award. * * *" Within the limits prescribed, the owner's right to interest is made a substantive right.

By Acts 1958, § 33-70.10 was enacted so as to provide for payment of interest at five per centum per annum on an excess over the amount deposited "from the date of such deposit *to the date of payment into court.*" It also provided that "In no other instance shall interest be allowed on any award."

It thus appears that in allowing interest, the court acted under Acts 1958, ch. 581 (§ 33-70.10, 1958 Cum. Supp., Code 1950) which was not in effect when the original certificate (which did not vest title) was filed on October 7, 1955, nor in effect on August 20, 1956, when the taking occurred. Acts 1956, ch. 565, which was in effect when certificate A651 was filed and title vested, provided that on the excess over the award interest at five per cent should be allowed from the date of the deposit to the *date of the award,* and that statute was applicable and controlling in this instance.

For the reasons stated the order appealed from will be reversed, the commissioners' awards set aside, and the cause remanded for a new trial not in conflict with the views expressed herein.

*Reversed and remanded.*