WILMINGTON HOUSING AUTHORITY, a public body corporate and politic, organized and existing under the laws of the State of Delaware, v. Nos. 312-314 East Eighth Street, containing approximately 2280 square feet.

ISADORE NEWMAN and ROSE NEWMAN, his wife, and HYMAN COHEN and NAOMI COHEN, his wife, SAMUEL COHEN, SADIE TOUMARKINE, CHARLES I. BELFINT and HAROLD W. FRAME, surviving Trustees of the Trust under the Will of Harry Cohen, deceased, Mortgagees, and MINNIE NAIMAN, Mortgagee, Owners of said property or of some part thereof or interest therein; and Unknown Owners.

(*March* 29, 1963.)

LYNCH, J., sitting.

*Daniel L. Herrmann* for Defendants.

*Thomas Herlihy, Jr.*, and *Thomas Herlihy, III*, for Wilmington Housing Authority.

Superior Court for New Castle County, No. 1564, Civil Action, 1960.

LYNCH, J.:

Wilmington Housing Authority,[1] plaintiff herein, is the designated public body to exercise the powers, functions and duties of a Slum Clearance and Redevelopment Authority. It has been vested with all the powers, functions, rights, duties and privileges of such an Authority under Title 31 *Del. C.*, Chap. 43, including the power of eminent domain in order to acquire any real property deemed necessary for a Slum Clearance and Redevelopment Project. For some time now it has been engaged in a Slum Clearance and Redevelopment Project known as Poplar Street Project A in Wilmington, which includes the lands and premises herein sought to be condemned.

These lands and premises are known as 312-314 East Eighth Street in Wilmington and were owned by defendants Isadore Newman[2] and Rose Newman, his wife, and Hyman Cohen[2] and Naomi Cohen, his wife. The property had been used for a number of years as a tap room and package store, for retail sale of alcoholic liquors, on and off the premises.

After a Commission[3] was chosen, pursuant to Title 10 *Del. C.* § 6108, trial was had commencing June 27, 1962, resulting in an award by the Commissioners on July 2, 1962, in the sum of $15,500.00. On July 5, 1962, Defendants moved to set aside the award and to grant a new trial on the issue of just compensation. Several grounds were advanced as reasons for the granting of the motion. These several grounds will be considered *seratim*.

1. Defendants contend the Court erred in barring evidence of defendants' gross business income and in denying

---

[1]Referred to hereafter as Plaintiff.

[2]ReUferred to hereafter as Defendants.

[3]An order granting possession was entered January 27, 1961 and an order entered February 21, 1961, directed withdrawal of the sum of $15,200.00, deposited by plaintiff, which sum was ordered disbursed to defendants, including the named mortgagees.

defendants' motion for continuance, made following such ruling. Defendants do not contend that loss of business income or business good will is compensable. They do contend, however, that evidence of gross volume of business is relevant to the issue of fair rental value of the premises, citing the general existence of "percentage leases" for retail liquor outlets such as are involved here. They contend that such fair rental value is, in turn, relevant to the issue of fair market value, the ultimate issue in the case.

At an early point in the trial the Court ruled Defendants could not introduce evidence of gross volume dollar of sales of the taproom and the package store. The Court's ruling was repeated on several occasions during the trial and covered Defendants' several efforts to show records of gross sales for the five year period before 1958.[4]

Defendants note that the following appears at pages 177-179 of the Transcript of the Trial; their argument is based on this colloquy, hence it is set forth somewhat fully.

"MR. HERRMANN: Your Honor, I am about to call Mr. Newman and I plan, in line with the *Ploener* case, to lay the foundation for the opinion of Mr. Mason, who will show—and Mr. Mason's opinion will be based on—his approach will be based on certain things.

\*  \*  \*  \*  \*  \*

"Mr. Longenecker will have an opinion based on the rental income method, and the rental income method is related to the gross business done—

---

[4]The parties stipulated that 1958 was the 1st normal year in which there was a market for sales and purchases of real estate in the Slum Clearance area.

"THE COURT: (Interrupting) Well, Judge Herrmann, we have rejected that. You have heard my ruling and I am not going to change my ruling.

"I am now ruling that the business was not taken, that the fact that a business,—and I can show you countless cases where even the loss of business, when you move it from one place to another, is not admissible, * * *.

\* \* \* \* \* \*

"MR. HERRMANN: Sir, because our whole case is planned on it, I want to make my position clear.

"We are talking about the gross volume of business only, with relation to fair rental value, and rental value is related to fair market value, and in the *Ploener* case we were permitted to do it.

"THE COURT: You have my ruling, Judge Herrmann. You can make such use of the rental value as you have charged or set aside, and I will charge on that.

"MR. HERRMANN: Very well, sir.

"THE COURT: I may say—and this is for the benefit of both of you— I am not happy with the rule of the *Ploener* case, and that is why I shall, in the course of my Charge, when and if one is made, tell the Jury that any matter which would have an effect upon the market value of the property are proper matters for them to consider, including the physical condition of the property, the history, the rental value, future prospects, the opportunity for increasing the business or the restriction of the opportunity, and the reasonable likelihood of conditions which would in any wise tend to make it more or less valuable in connection with what would be the fair market value on the day of the appropriation.

"Now, that is the part that I propose to add to the charges that have been * * * heretofore * * * made, because I think that those factors are to be considered.

"Mr. Cohen has said that his property has had a history of a license since time back to, well, the obolition of Prohibition times. That would give it a certain stability of rental value.

"Now, that is what I propose to let the Jury consider, and, as far as I am concerned, I have done the best I can. If I err, it is only because of my human incapacities.

"MR. HERRMANN: Your Honor, we are going to have to ask for a continuance. Mr. Mason's whole theory of the income valuation has been based upon the proposition that it was a $100,000 business.

"THE COURT: The motion, coming as it does, is denied.

"In the *Ploener* case, you had a [written] lease, [and the lessor and lessee were separate entities] * * *, in this case [the leasehold] has been held to be merged with the freehold.

"Well, we have made no progress today by reason of constant argument over points which I have ruled on. If I have erred, we can take care of it in a motion for a new trial, or if you want to take a direct appeal to the Supreme Court.

"MR. HERRMANN: All right. I am ready to proceed.

"THE COURT: Bring in the Commissioners, please.

"(The Commissioners here returned to the Court.)"

Defendants argue they had prepared their case upon the basis of the unreported case of *Wilmington Housing Authority v. Ploener* (C. A., No. 634, 1960). That case involved a property with a lessee—a different entity than the lessor—holding a written "percentage lease". As here, there was a taproom

and package store. Here, however, the Defendants both owned the propery and operated the business of selling alcoholic liquors at retail. There was no credible evidence of a lease.

Defendants based their arguments entirely on the *Ploener* case and by references to a handbook known as "Appraisal of Real Estate",[5] published by the American Institute of Real Estate Appraisers. They contend the refusal of the Court to follow the *Ploener* case and to give legal effect to the theories appearing in the cited handbook was error and highly prejudicial to their case; that after ruling business income is not relevant, the Court should have granted Defendants' motion for a continuance. I do not regard these points as well taken.

In the colloquy set forth above at pages 4-6, the Court noted that Plaintiff was not taking Defendants' business; as a matter of fact it was shown, in the course of trial, that Defendants had opened another package store, albeit in a different part of Wilmington. They still had their business.

As heretofore indicated, there is an appreciable difference in the fact situation presented by the *Ploener* case and that presented in the case at bar. Moreover, Defendants did not accurately state the rule handed down in *Ploener*.

The language used by Mr. Justice Terry, now of our Supreme Court, (he formerly was President Judge of this

---

[5]It is clear from reading this work there was no obvious recognition by the authors of the legal principles that may be relevant and material in appraising of properties in eminent domain cases. In many respects this handbook makes stimulating reading and is of help to the appraiser; it could be improved by having one well grounded in the legal principles pertaining to appraisals, as followed by Courts, review, and possibly rewrite, the book in light of the fundamental legal principles which the Courts have adopted in valuation of properties in eminent domain cases. I don't want to be misunderstood—the book is well written and suggests many ideas which could be regarded as principles underlying the work of appraisers; unfortunately, the failure of the authors to give regard to Court precedents does militate against its usefulness in deciding legal questions.

Court), in making his ruling in *Ploener*, relied on by defendants, differs from the manner it was expressed in this case.

"MR. HERRMANN: So, as I understand it, the record now shows the Court's confirmation of the ruling as I announced it.

"THE COURT: I am not sure of that, Judge Herrmann. You have got two different items here. You have the value of this property, the fair market value of it, the loss occasioned to the owner by the taking, and you have the loss occasioned to the lessee by the taking, which terminated his lease—or the corporation's lease.

"Now, I have ruled that you may show the fair market value of that lease from the time of the taking down to the termination of that lease, and that you may show the business, and the income over a five-year period prior to the taking, as an aid to the jury in determining the fair market value of that lease, and the recovery to the corporation would be the difference between the contract price as stated in the lease and the fair market value of that lease that they should determine by reason of the hearing of any testimony."

In the colloquy set out at page 4, I indicated some distress at what had been ruled in the *Ploener* case; I was of opinion then and now that in condemnation cases the Commissioners can make but one award, and that should include all interests. I am aware of and recognize the rule that a "lessee" is recognized as an "owner" in eminent domain cases, see *Nichols on Eminent Domain*, Vol. 2, 3rd Ed., §§ 5.22 and 5.23 and "is entitled to compensation for the taking of" the lease interest, but that question is not before me. My concern was over what was said in *Ploener* as to the kind of admissible evidence in "leasehold" cases, but since this case does not involve a "leasehold" interest, the distress I entertained in the course of trial as to the *Ploener* ruling is no longer a factor. I regard that case as in no wise a precedent;

it holds only that evidence of gross sales is admissible in leasehold cases where there is a valid existing lease. In *State ex rel. Smith v. 0.15 acres of land (State v. Mintzer)*, 3 Storey 58, 164 A. 2d 591 (Super. Ct. 1960), affirmed 3 Storey 372, 169 A. 2d 256 (Sup. Ct. 1961) evidence of "gross receipts of the business and its expenses" were received *without objection* in a leasehold case, 164 A. 2d at p. 592; this was emphasized by the Supreme Court, 169 A. 2d at p. 258, but that ruling is not to be construed as approving such proof. The Defendants here were allowed to introduce evidence of gross gallonage of wines and liquor and cases of beer sold on the premises; they were also allowed to show statistics produced from the Delaware Alcoholic Beverage Control Commission, showing their business rated first on the east side of Wilmington. Such evidence is admissible. *State Highway Com'r v. Hudson Circle Service Center, Inc.*, 46 N. J. Super. 125, 134 A. 2d 113, 117 (N. J. Super. App. Div. 1957); and see *Mintzer* case, *supra*, where our Supreme Court noted (*Id.*) "Proof of values seems to be to permit proof of all the valid elements of value, including such facts as the owner would properly and naturally use to influence a prospective purchaser. * * *."

The Defendants were not precluded from showing evidence of the value of the business as part of the basis for the rental income approach, but if under the facts shown, the Court had admitted evidence of gross income it would be approving bringing speculative evidence before the Commission and raising collateral issues.

The Trial Court has discretion in the admission of evidence, see *State Highway Com'r v. Hudson Circle Service Center, Inc.*, 134 A. 2d at page 117 and discussion at pages 5 and 6 of *State v. Bell and Abrams*, decided February 27, 1963, and not yet reported, and can exclude any evidence which will raise collateral issues, not determinative of the issues to be decided by the Commission. See *State v. Bell and Abrams, supra*.

This was pointed out in *City of Los Angeles v. Deacon*, 119 Cal. App. 491, 7 P. 2d 378 (Cal. Dist. Ct. App. 1932). There, a rock and gravel plant was operated on the property being condemned. The lessee who operated the plant was allowed, over objection, to testify, as to the net profits of the plant. The California District Court of Appeals held it was error on the part of the Trial Court to have admitted such evidence and that it was prejudicial error, and the Trial Court was reversed.

The District Court of Appeals said, 7 P. 2d at p. 379:

"* * * To accept a statement of net profits as a fact to be taken into consideration in arriving at market value, of necessity opens the door to an investigation into the accounting system of those operating the plant; into the costs of original installation and replacements; raises questions of efficiency and skill; and leads into innumerable other side roads and alleys. * * *"

What the California Court said about net profits applies with equal force to evidence of gross income. The above reasoning used by the California Court applies to the offer of evidence of gross sales as made in the case at hand. It would have taken the already lengthy trial off on an issue—far beyond the scope of a condemnation proceeding. See *City of Newport Municipal Housing Comm. v. Turner Advertising, Inc.*, Ky., 334 S. W. 2d 767, 770 (Ky. Ct. App. 1960); see also discussion in Vol. 1, *Orgel on Valuation under Eminent Domain*, §§ 18 and 19, pages 84 *et seq.*, particularly the footnote citations on page 87, showing special problems arising in unusual cases.

The pertinent part of the Delaware Constitution of 1897, Article 1, Section 8, *Del. C.*, is as follows:

"[N]or shall any man's property be taken or applied to public use without the consent of his representatives, and without compensation being made."

Although the defendants herein insist they are not claiming compensation for loss of business or loss of business good will, the questions they raise indircetly involve such elements and present the opportunity to settle the general problem in this Court, as well as the effect of a "taking" of a property and as the taking relates to the business conducted thereon.

Thus, a property owner is only entitled to compensation for the "property" taken and not for any business on that property. It is well settled that when land occupied for business purposes is taken by eminent domain, the owner is usually not entitled to recover compensation for the taking or destruction of his business, since the business is something entirely distinct from the market value of the land upon which it is conducted; it is not considered in determining the value of such land except insofar as it illustrates one of the uses to which the land taken may be put, 4 *Nichols, Eminent Domain,* § 13.3, pp. 433-443. The general rule is stated in *Lewis, Eminent Domain,* 3rd Ed., Vol. 2, § 727 at pages 1271, 1272:

"While it is proper to show how the property is used, it is incompetent to go into the profits of the business carried on the property. No damages can be allowed for injury to business. The reason is that the constitution and the statutes ordinarily worded, require only that just compensation shall be made for the property taken. * * *. The business conducted upon the property is not taken and the owner can remove it to a new location. * * *."

In the recent case (1962) of *Commonwealth Dept. of Highways v. Smith,* Ky., 358 S. W. 2d 487, the Kentucky Court of Appeals ruled, at page 488, that evidence of gross income from a commercial enterprise and of damage to a business was improperly admitted.

The property taken was improved with a restaurant building, a metal shed used as a plumbing shop, and a small

two story apartment building. It was the nearest commercial enterprise adjacent to a large industrial area. The Court ruled that damage to the business was not a proper element to be considered, and it cited *Nichols on Eminent Domain, supra*, as support for so ruling. The Court said, in 358 S. W. 2d at page 488:

"Also, on a new trial, evidence of gross income should be excluded. We said in *City of Newport Municipal Housing Commission v. Turner Advertising, Inc.*, Ky., 334 S. W. 2d 767, that injury to business or loss of profits is not a proper element of compensation in condemnation proceedings. Gross income, of course, does not necessarily prove a reliable measure of profits * * *. But, where income is derived mainly from the skill of the operator rather than from the productivity of the property, any testimony pertaining to that income should be excluded."

It is important to note that the Kenucky Court of Appeals said evidence of gross income was inadmissible because it was not reliable.

The general rule regarding the use of a business on the land to be taken as a criterion of the market value of the land is stated in 4 *Nichols, Eminent Domain,* § 13.3(1), p. 443:

"As stated above, the business conducted upon land is generally considered entirely distinct from the market value of the land and therefore has no determinative influence upon it except insofar as it illustrates one of the uses to which the land taken may be put. The general rule in this country is that such business and the fruits thereof are too uncertain, remote and speculative to be used as the criterion of the market value of the land upon which such business is conducted. * * *"

The gross income of the liquor business in the case *sub judice* is dependent on many factors, particularly in the area where

the businesses were conducted, all of which were noted or referred to in the course of the trial.

The recent case of *May v. Dewey, et al.*, 201 Va. 621, 112 S. E. 2d 838 (Va. Sup. Ct. App. 1960), involved a similar issue as is presented in the case *sub judice*.

*May* was a condemnation proceeding involving two parcels of land on which were located rental offices, a hardware business and a restaurant. The owner of the land conducted the hardware business and leased the restaurant business. The lease was a percentage lease.

The Virginia Supreme Court of Appeals held, 112 S. E. 2d at page 847, that the Trial Court should not have admitted evidence of gross receipts or gross sales of the businesses on the property. The Virginia Appeals Court said, at the page noted:

"* * * Nor should the gross receipts of the tenant or the owner in the business conducted by them upon the two parcels of land have been admitted in evidence before the commissioners in the condemnation proceeding.

"Evidence of the rent paid by the tenant to Dewey was admissible as tending to prove the value of the land, but testimony as to the gross sales or to the percentage thereof from which the rent was computed should not have been admitted. Profits and losses from the businesses are too speculative and uncertain to be considered in assessing compensation for land taken or damage to the residue. *Lewis, Eminent Domain* * * *."

*Herndon v. Housing Authority of City of Dallas*, Tex. Civ. App., 261 S. W. 2d 221 (Tex. Ct. Civ. App. 1953), involved a taking by eminent domain of a property operated by the owner as a grocery and a cafe and on which he resided in a frame dwelling. The owner sought to introduce evidence of the gross income and profits derived from the grocery and

cafe business. The Trial Court excluded such testimony. The Texas Court of Civil Appeals upheld the ruling, saying, 261 S. W. 2d at pp. 222, 223.

"This very question is the subject of an annotation in 7 A. L. R. 163. Here is the rule as stated on page 164 in the annotation:

" 'With remarkable unanimity the American jurisdictions hold that evidence of profits derived from a business conducted on property is too speculative, uncertain, and remote to be considered as a basis for computing or ascertaining the market value of the property in condemnation proceedings.'

"The reasons generally given to support the rule are: (1) Ordinarily the amount of profit depends more upon the capital invested, general business conditions, and the trading skill and business capacity of the person conducting it than it does upon the location of the business. * * *; and (2) it is only the real estate which is being taken, not the business. The owner may keep his business and continue to operate it at a different location."

It is to be emphasized that the owners, the Defendants, still have their liquor business and are operating it at a different location. Thus, their liquor business was not taken.

Because the Court is of opinion that Defendants had no proper basis or right to rely on their concept of the *Ploener* case, it holds that their first contention—including their argument that the Trial Court abused its discretion in denying the request for a continuance—should be denied. No part of the doctrine of *stare decises* is involved in the case. See 14 *Am. Jur.*—Courts—§§ 77, 79 and 82. *Ploener* is a single and unreported decision; it is limited to its facts, and no sound reason was or has been shown why the holding should be extended to the case at bar. Defendants acquired no rights based on the holding in *Ploener* and since the facts of the

cases differ, it cannot be said to be determinative of the situation presented by the Defendants in this case. See discussion in 21 *C. J. S.* Courts §§ 186, 187, 210 and 212.

2. Defendants next argue that the Court abused its discretion in permitting Plaintiff to adduce testimony of a property at 605 West 8th Street as a comparable to the property in the condemnation proceeding.

The Transcript shows (Tr. 432) this particular property was on the same street—but 10 to 12 blocks away from Defendants' property—and located in an area zoned Business A —same as Defendants' property—and it had been sold in October of 1958 for $5,500.00. It is true it was used as a residence but it was located in an area which had considerable commercial development, and it could be made a commercial property.

Sales of similar or "comparable" land is discussed in *Nichols*, Vol. 5, 3d Ed., *on Eminent Domain*, §§ 21.3 and 21.31 pages 417/461; 2 *Lewis on Eminent Domain*, 3d Ed., §§ 662, p. 1138 *et seq.*; 18 *Am. Jur.*—Eminent Domain—§ 351 and *Wilmington Housing Authority v. Harris, Jr.*, 8 Terry 469, 476, 93 A. 2d 518, 522 (Super. Ct. 1952).

In *Lewis*, pages 1139-1140, it is stated:

In regard to the degree of similarity which must exist, between the property concerning which such proof is offered and the property taken, and the nearness in respect of time and distance, no general rules can be laid down. These are matters with which the trial judge is usually conversant, and they must rest largely in his discretion. \* \* \*."

See *Shattuck v. Stoneham Branch Railroad Co.*, 6 Allen

(Mass.) 115, 117 (Sup. Jud. Ct. Mass., 1863).[6] in this case the Court said (*Id.*)—"* * * any reasonable exercise of his discretion cannot be excepted to, * * *."

In 18 *Am. Jur.* at page 995 it is stated:

"* * *. The determination of the similarity of the lands involved in the proffered evidence to those sought to be condemned, and whether the transactions are sufficiently close in point of time to afford a fair comparison, is a matter resting largely in the discretion of the trial court.. * * *."

In 29 *C. J. S.* Eminent Domain § 273 at page 1262 the statement is to be found that:

"* * * the range of inquiry to be allowed is to a considerable extent in the discretion of the trial court * * *."

The discussion to be found in *Application of Port of New York Authority*, 28 N. J. Super. 575, pages 367/368, 101 A. 2d 365 (N. J. Super. Ct. App. Div. 1953) is of interest and most apposite. The Court said regarding evidence of comparables (101 A. 2d at p. 368):

"While the resemblance of two or more properties may be conspicuous, yet it is not ordinarily difficult for counsel of one party or the other to indicate some dissimilarities. The determination of the desirable similarity is not and perhaps ought not to be governed in all instances by a rigid and inflexible rule or standard, and consequently the decisional law has

---

[6]In the *Harris* case, this Court adopted the "Massachusetts" Rule relating to evidence of "sales of other similar property in the neighborhood". The Court stated (*Id.*):

"It was required that the relevance of such evidence be established to the Court's satisfaction by a preliminary showing * * *."

This demonstrates that the Court is required to exercise a discretion. In light of what was said by the Supreme Court of Massachusetts in the *Shattuck* case, *supra*, it seems doubtful if the trial court's discretion is subject to review. In any event, this Court's ruling in *State v. Bell and Abrams, supra,* as to the extent of the Court's discretion, is a safeguard to litigants.

bestowed upon the trial judge a 'wide discretion' in deciding 'whether the conditions are such as readily to admit of reasonable comparison between the land taken and the lands so sold.' * * *"

The Court rules that this second contention of the Defendants is without merit.

3. Defendants contend that the Court erred in admitting evidence regarding Rule 48 of the Delaware Alcoholic Beverage Control Commission 4 *Del. C.* Appendix and a possible violation of the Rule by one of the Defendants.

So far as is pertinent to the arguments presented, that Rule provides:

"Unless the Commission shall otherwise determine, every application for a license or renewal thereof, except a Gathering of Persons License, to sell alcoholic liquors shall be accompanied by a *notarized statement from each member of a partnership* or association and each individual applicant *setting* forth whether or not such individual or individuals has ever been convicted of a violation of any law of the State of Delaware or of the United States; the source of finances to be used in setting up and operating the proposed business for which a license is requested; *that no person other than those named has having financial interest in the proposed business has any financial interest* of any kind *in the* corporation, *partnership* or individual *making application for the license.*" (Emphasis supplied)

Title 4 *Del. C.* § 910, provides, *inter alia*, that those who violate any regulation of the Commission "shall, in addition to the payment of costs, be fined or imprisoned, or both". Title 4 *Del. C.* § 309, empowers the Commission to make and adopt regulations.

In the course of cross examination of defendant Cohen, Plaintiff's counsel commenced questioning the Defendant re-

garding compliance with Rule 48, since it was clear Mr. Cohen had not signed the verified application for a liquor license. Mr. Cohen testified with regard to the liquor business on the property taken that *"we* [referring to Mr. Newman] ran it as a tavern and a package store" (emphasis supplied) (R-38); further, he testified that he was a "silent partner" in the business; he also testified that he received a salary from that business (R-39). Again he testified that he was a partner in the building (R-68). Plaintiff in its brief pointed out—"It is also very significant that even defendants' counsel said that Mr. Cohen was a 'silent partner' ". (R-10).

There was an objection to this line of questioning, which objection was sustained by the Court, and it was ordered stricken. Twice the Court directed the Commissioners to ignore the testimony and argument of counsel.

Plaintiff argued in its brief (p. 19):

"One of the very central issues in this case is the nature of the various interests in this property. In fact, it was very important that all evidence touching upon the legal relationships of the parties be admitted in order to aid the Court in its determination of whether or not there was a lease and who were the parties to that lease. In light of the statements of Mr. Cohen and his counsel, and the issues of the case, the plaintiff's attorney asked the question regarding Rule 48 in order to fully bring out the nature of the legal relationships."

Counsel for Defendants argue (page 14 of his brief) that it was prejudicial error on the part of the Court to leave the jury with the impression that Mr. Cohen and Mr. Newman had committed a criminal offense in connection with Rule 48. Since the Court had sustained Defendants' objection and had twice instructed the jury that the only evidence they were to consider was sworn testimony and documents, and not what the attorneys say, it is extremely speculative to say that a matter not in evidence impressed the jury in this case. The

Defendants' attorney was allowed to fully state his objection to the question before the jury and present his position, hence I am certain this immediately obviated any prejudicial effect on the jury.

The last point argued by Defendants was Ground No. 5 of their motion to set aside the award in this case. That was:

"The Court erred in admitting evidence of a violation of an anti-gambling statute in an adjacent property."

Plaintiff's appraiser testified at length about the conditions of the properties located in the neighborhood and in the vicinity of the Defendants' property,—but was restricted to the block in which Defendants' property was located (R-378). He described (R-380) this neighborhood:

"A   The properties fronting on the south side of Eighth Street starting with the 316, the house 316 was in poor condition. It was vacant. There were no locks on the doors. It was in poor condition. The corner lot I believe was owned by the city. There were some cars parked on there and a lot of trash, and so forth.

"The subject properties of 312 and 314 [East Eighth Street] on the outside were in fairly good condition. The candy store at 308, [East Eighth Street] it was in good condition.

"Then, the rest of the building up to 728 Wilson, which is the corner property, that was not in good condition physically on the outside.

"Q   What was the situation with the properties on Wilson Street?

"A   On Wilson Street they were in poor condition except for about 2 houses in the middle of the block that were owned privately. The owners lived there. They were in pretty good condition.

"On Poplar Street they were the same. They were in poor condition except for one or two.

"Now, the house next to the vacant lot on Poplar Street was owned by a man that was retired from duPont, Jesse Lockett. That house was in very good condition.

"Q   I am handing you Plaintiff's Exhibit No. 7 (handing a photograph to the witness).

"A   This house was in very poor condition (indicating on the photograph). This house was in good condition (indicating).

"Q   Where is that?

"A   That is south of the Lockett house adjoining. That was in good condition, also, and the rest of the block was poor.

"Q   Will you state the condition, if any, in connection with this neighborhood, as to, at least, its deterioration, obsolescence and population.

"A   Well, there was a high density.

"Q   What do you mean by a high density?

"A   Well, there was overcrowding of the houses. Many apartments—where there should have been two, maybe there were four or five.

"You had a high rate of obsolescence.

"Q   What do you mean by obsolescence?

"A   Well, the architecture; the fact that most of the houses did not have central heating. Many did not have hot water. Many were in very, very bad physical condition, rotting woodwork, some lacked bath, and rotting window sills, loose brick holes in the walls.

"Q   Having examined the adjoining properties, are you in a position to make any observation so far as sanitation of the adjoining houses?

"A    When we say 'adjoining', do we mean those immediately adjoining or do we mean those in the vicinity?

"Q    I will correct it; those in the vicinity, if you can recall?

"A    Right around this property in question, of course, the house next door was alike, so that there was not anything I could say about sanitation there.

"But the properties going west on Eighth Street were all right. Several of the properties on Wilson Street had outhouses; and two properties on Poplar, I questioned the sanitation, but I don't think that they are within the limits that the Judge will permit. They are closer to 7th Street."

He was then asked (R-382) to "state what type of business was in the property immediately adjoining 312 East Eighth Street". There was an objection to the question.

Plaintiff's attorney argued (R-385):

"I think it is a very important issue to show the character of the neighborhood. It is a vital issue in this case to show the character of the neighborhood, and that might explain other matters in the case."

Following considerable argument, pro and con, the Court ruled (R-388):

"It is only for the purpose of affecting the surroundings, just like we permitted the pictures to go in.

"That is my ruling, gentlemen, and that is all I will permit there, Judge Herlihy, just that it was being used as a number drop, if you have independent proof, and not merely the fact that it has got Pepe's sign on it."

Mr. Donovan's answer (R-374 *et seq.*) to the question was as follows:

"A    A numbers establishment.

"Q   And how do you know that?

"A   I was in the property when the number was posted, and the door was locked until such number was posted.

"Q   What time of the day was this?

"A   It was, I would say, after three o'clock, but it was approximately about 3:30 to 4:00 o'clock; and a colored gentleman was in there and there were three white men, and I told them that I was finished and thanked them.

"Q   Why were you there?

"A   I was there to appraise the property for the Housing Authority.

"Q   Right.

"A   And, as I went out, a young colored man came bustling in the door as they opened it for me, and said, 'I hit and I want to get paid'.

"The older man want to keep him out and I was in between them, and they got on the floor and I left.

"Q   And what happened before you started out the door?

"A   Well, they had a piece of cardboard roughly about this size (indicating) and they were printing three numbers on it. Now, what the numbers were, I didn't know.

"Q   What do you mean by three numbers?

"A   Well, 903, 221, 652."

Following the answer, Defendant's counsel then stated to the Court (R-396):

"MR. HERRMANN: Your Honor, because my objection might leave the Jury with the impression that it was my own clients, I withdraw the objection. I fear that my objection might indicate that one of my own clients was involved."

The course of cross examination of Plaintiff's appraiser on this "numbers bank" incident is to be found on pages 470/471 of the Transcript, *i.e.*:

"Q   Now, this testimony of yours about Pepe's store near this property, at which you saw some numbers being written one day, what effect, if any, do you feel this incident had on the fair rental value or the fair market value of a package store and a tap room nearby?

"A   It would have definite effect in the economic depreciation in the property.

"Q   On a package store?

"A   On any property.

"Q   What effect would such a situation have upon a package store and a taproom catering to the colored people on the east side?

"A   I would have to say again, on the depreciation of the property alone, sir, the economic depreciation.

"Q   Would you say that a package store and a taproom would be less in demand or less desirable from a purchase point of view or a rental view because of that?

"A   That would depend upon the owner, sir, because many people wouldn't want to be next to a numbers place like that is.

"Q   Assuming a buyer buying this taproom and this package store to accommodate people on the east side, do you think that the incident which you saw depreciated the fair market value or the fair rental value of this property?

"A   I think it could have, yes sir.

"Q   Do you think it did?

"A   Yes, I do."

█ This was the record supporting Defendants' point. Since Defendants withdrew their objection to the testimony I rule I am not compelled to consider this contention; it is as if no objection was made, see generally 53 *Am. Jur.*—Trial § 143; 89 *C. J. S.* Trial § 483 and 5B *C. J. S.* Appeal and Error §§ 1801-1803.

Examination of several of the cases cited in Chapter 46, Volume 5, *Moore's Federal Practice*, 2d Ed. and in Volume 2B *Barron and Holtzoff* (Wright Ed.), Federal Practice and Procedure, pages 309-319, do not help. True it is that in *Barron and Holtzoff*, pages 310-312, it is stated:

"An objection must be so definite as to indicate to the trial court the precise ground upon which the evidence is inadmissible or the ruling objectionable. The purpose of an objection is to call the court's attention directly to the matter and thus enable it to avoid error. Lawyers who were accustomed to making general objections followed by specific exceptions will find that the rule merely changes their routine. Those who fail to make specific objections may waive errors that otherwise would be available on appeal. A specific objection is necessary, and counsel may ask for a ruling disposing of his objection. The requirement is not a mere technical formality but substantial observance is vital both to protect the trial court and the parties. Without a specific objection and ruling thereon, the appellate court will ordinarily decline to review the question."

Nowhere, however, have I found a case holding that if counsel withdraws his objection, the Trial Court need any longer take cognizance of the matter presented. Common sense dictates that such withdrawal makes the objection of no further effect; to be on the safe side, however, I will consider the arguments advanced and indicate my ruling thereon.

Defendants have cited and apparently rely on *Popwell v. Shelby County*, 272 Ala. 287, 130 So. 2d 170, 87 A. L. R.

2d 1148, 1156 (1960) and *Lawrence v. Metropolitan Elev. R. Co.*, 126 N. Y. 483, 27 N. E. 765, 13 L. R. A. 102 (1891).

In *Popwell*, defendants point out, a county, in seeking to condemn defendants' property for the construction of a highway, was permitted by the trial court (which had instructed the jury that the valuation date was April 24, 1956) to introduce in evidence a bill for an injunction filed in 1953 to restrain defendants from using the property for the purpose of gaming, as well as the order granting a temporary injunction and the final decree making the injunction perpetual, rendered on January 19, 1954,— the admission of such evidence being in conformity with the county's contention that the market value was or could be less because defendants' house bore the reputation of having been previously used for gaming.

The Supreme Court of Alabama, notes the Defendants, held that the trial court erred in admitting such evidence, because (1) it would be difficult, if not impossible, to say with any reasonable accuracy by how many dollars the reasonable market value would be reduced by the unfavorable reputation arising from the particular evidence, and (2)—and this was the compelling reason for excluding evidence of reputation—that at best it was a matter of sentiment and that all elements of sentiment were to be excluded.

Plaintiff argues—and with some considerable logic in its position—that in the case at bar the Plaintiff introduced evidence of illegal activity in an adjoining property, not the property which was the subject of the condemnation proceeding,—and this was a condition of the neighborhood; also, this evidence was of a current nature as compared with the valuation date of 1958. Thus, says the Plaintiff, in our case, there is evidence of an illegal activity which is current, as opposed to the evidence in *Popwell*, which concerned an illegal activity which had ended. Consequently, the evidence in this case was a reality; certainly it was not at all senti-

mental and it was properly admitted to aid the jury in its determination of the award, which would be affected by conditions in the neighborhood.

It cannot be ignored that Plaintiff's appraiser testified—without objection—see pages 21 *et seq.*, *supra,* as to the condition of the properties in the neighborhood. I find it difficult, if not impossible, to differentiate the poor condition of surrounding structures from the apparent undenied and apparently admitted illegal activity going on in an adjoining store. Both would be conditions that the Commission could consider in determining fair market value of Defendants' property. I stress that if there was reason to doubt the incident as related by the appraiser, I would have ruled it out because it would be opening collateral issues. This is not the present record.

The Texas Courts of Civil Appeals, *Connor v. International & G. N.R. Co.,* 129 S. W. 196 (1910) and *Goldforb v. Gulf C. & S. F Ry. Co.,* 243 S.W. 707 (1922) have upheld the evidence in condemnation cases of the character of use of adjoining properties in relation to the properties that were subject to the eminent domain proceeding. Under no stretch of one's imagination can I conceive that the incident is to be rejected as "sentimental" such as was the reasoning used by the Alabama Court in *Popwell,* cited above.

In the case at bar, the Commissioners were charged (R-486-487):

"Any fact or condition which tends to enhance or increase the value or tends to diminish or reduce the value of the property and thereby pertains to or affects the amount of damages accruing to the owners by the taking of the property may be properly considered by you gentlemen in your consideration and determination of the award that you may see fit to make. Stated otherwise, you may, in determining the fair market value of the property taken, consider everything in evidence which enhances or depreciates its worth.

"You may, in arriving at your determination of fair market value, consider such factors as the age of the property, the physical condition and appearance of the property, its history, the appearances and conditions of the immediate surrounding neighborhood, density of population of the neighborhood; the location in relation to transportation, churches, markets, schools and other like factors, the ability of the owners to rent portions of the property, including the evidence of what the fair market value would have been of such rental for all or portions of the premises; * * *."

Defendants did not object to this charge, so I cannot find any basis on which they can premise a complaint that they were prejudiced by the appraiser's testimony regarding the use made of the adjoining property. Had I been given reason to even believe there would be an issue on the incident, I probably would have kept it out as being on a collateral issue. I was not so advised nor did Defendants challenge the evidence.

No doubt can now exist but that the use of the adjoining premises for illegal gambling constitutes a nuisance *per se* and it would be the duty of the Attorney General to abate such a nuisance by appropriate injunctive proceedings. See Title 10 *Del. C.*, Chap. 71. It thus would appear clear that the existence of such a nuisance on the adjoining property could be an element that might well be considered by a prospective willing and able buyer in arriving at the fair market value of the property; I can well see that a prospective buyer could be influenced, if not prejudiced, by such a matter. The Plaintiff's testimony is that it would affect market value and Defendants have not disputed it, by denying the incident or otherwise than by an objection which was later withdrawn. It was for the Commission to give such effect to this testimony as it considered material. It could reject it, if it saw fit to do so. Whether such evidence did affect the amount of the award is questionable, but Defendants made no effort to show it

might have or probably did. Hence, and for all the reasons stated, I reject the contention as lacking in merit.

■ In concluding this opinion, I take cognizance of the statute, Title 10 *Del. C.* § 6108(g), which, as pertinent, reads:

"* * * Such awards shall be confirmed by the court unless the commissioners have been guilty of misconduct in their proceedings, or unless they have made an improper award to any party in interest, whether based upon an error of fact or law, in which events the court may, upon its own motion, or motion of any party filed and served within 5 days of the award, set aside the erroneous award in whole or in part, or modify it to conform to the facts as presented by the evidence, or to conform it with the law as announced by the court. In the event the award is set aside in whole or in part, the court may, in its discretion, recommit it to the commissioners with instructions."

As the statute prescribes the Court's power on motions to "set aside" an "erroneous award in whole or in part" or to "modify it [so as] to conform to the facts as presented by the evidence, or to conform it with the law * * *" it would appear necessary that it be shown that the award should not stand for one of the reasons ascribed by the statute. That is the way I read *Hurley v. State*, 10 Terry 64, 68, 109 A. 2d 396, 398 (Sup. Ct. 1954) and that was the express indication in *Martin v. State*, 1 Storey 315, 321, 145 A. 2d 76, 80 (Sup. Ct. 1958). In both cases, the Supreme Court seemed to emphasize that the statute controls the power of a Trial Court in the matter of setting aside an award.

I find no showing in the case at bar that this Court, under the conclusions reached, has power to vacate or set aside the award. Defendants' motion is, therefore, denied and an order may be presented providing for denial of Defendants' motion.