COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judges Annunziata and Clements
Argued at Alexandria, Virginia


METROPOLITAN WASHINGTON AIRPORTS
 AUTHORITY AND HARTFORD UNDERWRITERS
 INSURANCE COMPANY
                                            OPINION BY
v.   Record No. 2900-02-4        JUDGE ROSEMARIE ANNUNZIATA
                                          AUGUST 19, 2003
THOMAS E. LUSBY


        FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

        Benjamin J. Trichilo (Trichilo, Bancroft,
        McGavin, Horvath & Judkins, P.C., on briefs),
        for appellants.

        Michael A. Kernbach (Burgess, Kernbach &
        Perigard, PLLC, on brief), for appellee.


     Metropolitan Washington Airports Authority ("MWAA") and

Hartford Underwriters Insurance Company, appellants, appeal the

Workers' Compensation Commission's award of occupational disease

benefits to Thomas E. Lusby, appellee, citing four grounds for

reversal.  Appellants contend the commission erred 1) in finding

that Lusby's cardiovascular disease is attributable to his

employment; 2) in applying an erroneous legal standard of

causation; 3) in awarding continued disability benefits based

upon income that Lusby voluntarily limited; and 4) in finding

that Lusby had cured his unjustified refusal to work.  For the

reasons that follow, we affirm.

Procedural Background

On August 7, 1995, Thomas Lusby filed a claim for workers' compensation benefits alleging as grounds the existence of a compensable occupational disease, specifically coronary artery disease ("CAD"). The claim was initially heard before the deputy commissioner in a bifurcated proceeding to first determine whether the statutory presumption of Code § 65.2-402(B) applied.[1] The deputy commissioner found that it did, and the commission affirmed. In a subsequent hearing on August 9, 2000, the deputy commissioner found that the statutory presumption had been rebutted under Bass v. City of Richmond, 258 Va. 103, 515 S.E.2d 557 (1999), and dismissed the claim. On appeal, the full commission reversed the deputy commissioner's decision and found that the medical opinions admitted on behalf of MWAA were insufficient to rebut the statutory presumption. It remanded the case to the deputy commissioner for further proceedings, who awarded Lusby temporary partial disability benefits commencing March 16, 1998. The commission affirmed the

---

[1] Code § 65.2-402 provides:

> Hypertension or heart disease causing the death of, or any health condition or impairment resulting in total or partial disability of [covered employees] shall be presumed to be occupational diseases, suffered in the line of duty, that are covered by this title unless such presumption is overcome by a preponderance of competent evidence to the contrary.

-

award, modifying the beginning date for temporary partial benefits from March 16, 1998 to January 1, 1997. This appeal followed.

## Factual Background

Under the relevant standard of review, we consider the evidence in the light most favorable to the party who prevailed in the proceedings below, in this case, Lusby, together with all reasonable inferences that may be drawn. R.G. Moore Bldg. Corp. v. Mullins, 10 Va. App. 211, 212, 390 S.E.2d 788, 788 (1990).

## I. Employment History

The evidence established that Lusby began working for MWAA in July 1979, and remained employed there until May 5, 1995, when he was diagnosed with heart disease. While employed by MWAA, Lusby did not engage in actual firefighting or emergency rescue activities. His duties consisted primarily of "training drills and exercises" and, on occasion, outdoor inspections.

During the time Lusby worked for MWAA, he held part-time jobs as a tour bus driver for Gold Line Bus Company and as a security guard for Calvert Memorial Hospital and worked 80 hours per week. Acting upon medical advice, Lusby retired on disability from MWAA in May 1995. At the time Lusby retired, he held the position of assistant fire marshal. Shortly thereafter, Lusby was offered light-duty employment as a dispatcher with MWAA. The dispatcher position paid an annual

-

salary of $21,000 or an average weekly wage of $403.85; the position was not expected to continue longer than one year. Lusby refused the offered position because of what he believed was insufficient pay relative to his prior earnings of $44,000. The deputy commissioner determined that the refusal was unjustified.[2] Although he refused the dispatcher position, Lusby continued his part-time work for Gold Line Bus Company and Calvert Memorial Hospital. He also applied for a position as an inspector with the Alexandria Fire Department, but was not hired. After rejecting the dispatcher position, Lusby submitted an application for Civil Service retirement on February 16, 1996, stating he could not "fight fire at M.W.A.A."

In 1996, Lusby earned $527.05 per week in his two part-time jobs, in 1997, he earned $620.50 per week, in 1998, he earned $704.31 per week, and in 1999, he earned $783.19 per week.[3] Lusby acknowledged that he could have worked more hours at these two jobs and earned more income. However, his Civil Service disability pension restricts the earnings he can make. Lusby acknowledged that he did not request additional work hours because he did not want to jeopardize his pension benefits which would have been reduced had he earned more than $39,000 per year (80% of his base pay).

---

[2] Lusby does not dispute that the refusal was unjustified.

[3] Lusby worked part-time as a bus driver and full-time in security until 1998, when the time patterns were reversed.

-

## II.  Medical History

Lusby did not have heart disease before his employment with MWAA.  However, his medical history was significant for hypertension that was controlled by medication, high cholesterol, obesity, diabetes, and color blindness.  Dr. Martin Brown, MWAA's medical director, performed an annual physical on Lusby in September 1989 and found that Lusby satisfied the requirements for the firefighter position.

In the course of his employment, Lusby was exposed to smoke and fumes on the job, especially at car and pit fires, where fuel, chemicals, rags, and tires were burned.  Pit fires are controlled fires generating heavy black smoke; they are conducted to simulate aircraft fires.  He was also exposed to aircraft fuel fumes and smoke in the shop area he frequented while making inspections, as well as in his office, which was poorly ventilated.  His job duties did not include firefighting or performing emergency rescue services, but he was expected to complete all the tasks required of a firefighter and he had participated in those activities during controlled training drills and exercises.  He generally described the stress level on the job as the same as in other jobs, but noted periods of heightened job-related stress, specifically when he dealt with toxic chemicals.

-

Lusby was intermittently placed on light duty after the results of a stress test performed in February 1994, and repeated in April 1995, showed "a reason for concern."[4]  On April 28, 1995, a cardiologist, Dr. Steven Roberts, evaluated Lusby. Dr. Roberts reported that the results of a screening exercise electrocardiogram were abnormal, as were the results of a subsequent exercise and resting study, which "suggest[ed] scar[ring] in the right coronary artery and possibly the left circumflex artery as well."  Dr. Roberts performed a cardiac catheterization and angioplasty on May 5, 1995 and diagnosed Lusby with severe coronary artery disease ("CAD").

On May 19, 1995, Dr. Mahesh Shah, who assumed responsibility as Lusby's treating cardiologist, noted that Lusby suffered from premature CAD, without significant symptomatology.  Dr. Shah acknowledged Lusby's history of diabetes, hypertension and high cholesterol, and noted that Lusby's position as a firefighter "requires very harsh and extreme exertion under extreme conditions."  He recommended that Lusby retire or find alternative work, if MWAA failed to provide

_____

[4] Dr. Christopher S. Holland, the medical director of the facility where Lusby was treated, initially placed Lusby on light duty on February 4, 1994.  He returned Lusby to full duty on February 18, 1994.  However, after a stress test in April 1995 revealed "perfusion deficit highly suggestive for coronary artery disease," Dr. Holland placed Lubsy on light duty once again.

-

a position with modified duty requirements.  Lusby retired shortly thereafter.

On June 2, 1995, Dr. Holland found that Lusby was "[n]ot medically fit for fire fighting as a career."[5]  He reported the results to MWAA, stating that Lusby had a "history of obesity, diabetes, hypertension, elevated cholesterol, and a generally sedentary life-style, all which have contributed to his premature coronary artery disease."  He advised that Lusby's disease was severe, chronic, progressive, and unlikely to improve.  He concluded that, "although the [MWAA] and the career of fire fighting did not cause Mr. Luzby's [sic] coronary artery disease, the stress and physical demands of the job could result in myocardial infarction or other catastrophic cardiac events, given his compromised coronary artery circulation."  He also noted that, consistent with MWAA policy, permanent light-duty status was not available and that Lusby's medical condition could not be accommodated by MWAA "because every firefighter is expected to be physically capable of performing, safely and healthfully, all aspects of the job, even if they are not routinely called on to do so."  Dr. Holland recommended that MWAA consider offering Lusby less demanding positions in the non-public-safety sector.

---

[5] Dr. Holland had previously reported, on May 2, 1995, that the results of Lusby's thallium perfusion scan were "highly suggestive for coronary vascular disease."

On October 5, 1995, Dr. Shah had Lusby perform a thallium stress test, and he interpreted the results to be abnormal, "showing stress-induced ischemia."  In a report to Lusby's family physician on December 26, 1995, Dr. Shah reported that Lusby could not perform the work duties of a firefighter. Dr. Shah stated that "exposure to extreme exertion and temperature would cause undue stress on his cardiovascular system."

On July 15, 1999, MWAA's counsel sent a letter to Dr. Holland, asking whether Lusby's employment with MWAA caused his heart disease.  In response to the letter, Dr. Holland's opinion addressed only Lusby's contention that he was exposed to several chemical agents, which he believed "played a role in the development of [his] coronary artery disease."  Dr. Holland reported that:

> Coronary artery disease refers to narrowing
> of the coronary vessels due to
> atherosclerosis, the exact cause of which
> are [sic] unknown, but which is widely
> acknowledged to be due to the interaction of
> certain risk factors.  The principal
> modifiable risk factors include cigarette
> smoking, hypertension, elevated serum
> cholesterol, physical inactivity, and
> obesity, while increasing age, male gender,
> and family history are the principal
> non-modifiable risk factors.

Dr. Holland stated that non-work-related factors caused Lusby's coronary artery disease, specifically noting a "combination of 'bad genes' and lifestyle choices."  Dr. Holland confined his

-

discussion of work-related causes to Lusby's claim that his CAD was caused by exposure to certain chemicals. In his report, he listed four chemicals as "potential occupational cardiotoxic agents" and other miscellaneous agents and reviewed the literature describing their possible effect on cardiovascular health. He denied that four of the five chemical agents to which Lusby may have been exposed in his work as a firefighter would "cause" CAD, but noted that carbon disulfide could cause atherosclerosis, and nitro compounds could induce angina or cardiovascular death. He discounted their role in Lusby's case, however, opining that it was unlikely he had been exposed to such chemicals in the course of his employment. Dr. Holland concluded that "the medical literature does not support the contention that Mr. Lusby's periodic exposure to chemical fumes 'caused' his coronary artery disease."

Cardiologist Dr. Stuart Seides reviewed Lusby's medical records for MWAA and concluded that there was no association between Lusby's employment with MWAA and the development of his coronary artery disease. He stated, "Any attempt to make this association is contrary to our current scientific understanding as to the genesis of this process."

Cardiologist Dr. Warren Israel also reviewed Lusby's medical records for MWAA. In his report on August 19, 1999, Dr. Israel noted Lusby's history of diabetes, hypertension, obesity, prior cigarette smoking, cholesterol problems, a

-

sedentary life-style, ischemia and multiple coronary artery obstructions.  Dr. Israel agreed that Lusby had coronary artery disease, but opined that the disease in Lusby's case was "entirely explained" and caused by the multiple risk factors cited above.  Dr. Israel further opined that, while Lusby may have been exposed to multiple chemicals during his employment, "these would not be causative agents in the development of his atherosclerotic coronary artery disease."  However, in support of his conclusion that occupational stress is "not even [a] minor risk factor" for coronary artery disease, Dr. Israel explained that scientific investigations into a causal link between  work-related stress and coronary artery disease were inconsistent.  He concluded that, if such a relationship existed, it "would have been proven by now."  Thus, Dr. Israel opined, "based upon reasonable medical certainty . . . Mr. Lusby's atherosclerotic coronary artery disease would not be causally related to work activities as a firefighter, even if he were an active firefighter over the years."

Lusby was examined in August 1999 by Dr. Richard Schwartz.[6] Dr. Schwartz reviewed Dr. Roberts' records as well as other medical documentation and concluded that Lusby's family history was not a contributory factor, but identified other risk factors operating in Lusby's case.  He opined that Lusby's

---

[6] Dr. Schwartz was an associate of Dr. Steven A. Roberts, who had previously treated Lusby.

occupation-related stress could not be excluded as a cause of his coronary disease:

> This is documented both by history and by the medical records. Following the discovery of coronary artery disease, the patient was relieved of his duties in active fire suppression. This is a decision with which I concur. . . . [C]oronary artery disease is a multifactorial process involving many risk factors. Those present in Mr. Lusby include his occupational stress as a firefighter, his adult onset diabetes, his hypertension, and hyperlipidemia. As noted in the past, it is impossible to identify proportional causation amongst these risk factors. Likewise, it is impossible to exclude any of these risk factors by history. Therefore, one must conclude that it is at least as likely that his occupational stress contributed to his coronary artery disease as his hyperlipidemia. Clearly, there is no genetic, congenital, or traumatic cause for his disease.

Dr. Israel disputed Dr. Schwartz's findings, stating that Dr. Schwartz had failed to consider that, although Lusby's job title was firefighter, he only fought fires in controlled training, drills, and exercises.

## Analysis

### I. Statutory Presumption

It is undisputed that Lusby is an employee covered under the Virginia Workers' Compensation Act and that he is entitled to the presumption accorded police and firemen under Code § 65.2-402, which provides:

> Hypertension or heart disease causing the death of, or any health condition or impairment resulting in total or partial disability of [covered employees] shall be presumed to be occupational diseases, suffered in the line of duty, that are covered by this title unless such presumption is overcome by a preponderance of competent evidence to the contrary.

MWAA claims that it has satisfactorily rebutted the presumption and that the commission's award of benefits constitutes reversible error. We disagree.

"The commission having found in favor of claimant, it follows that all just inferences deducible from the evidence must be resolved by us in his favor. The Commission's finding may not be disturbed if it be sustained by credible evidence." Island Creek Coal Co. v. Fletcher, 201 Va. 645, 647-48, 112 S.E.2d 833, 834 (1960).

In Bass v. City of Richmond Police Dep't, 258 Va. 103, 515 S.E.2d 557 (1999), the Virginia Supreme Court held that an employer overcomes the statutory presumption by showing "both that 1) claimant's disease was not caused by his employment, and 2) there was a non-work related cause of the disease . . . . [I]f the employer does not prove by a preponderance of the evidence both parts of this two-part test, the employer has failed to overcome the statutory presumption." Bass, 258 Va. at 114, 515 S.E.2d at 562-63 (emphasis in original).

The commission found that MWAA did not rebut the statutory presumption because it failed to prove that Lusby's disease "was

-

not caused by his employment."  The commission based its conclusion on Dr. Schwartz's testimony, which attributed Lusby's CAD to occupational stress, and on Dr. Shah's diagnosis, which described Lusby's condition as "stress induced ischemia."  It further found that

> [t]hese positive opinions are not rebutted by the mere general denials of cardiologist Dr. Seides, or of occupational medicine specialist Dr. Holland. . . . [C]ardiologist Dr. Israel conceded that the association had not yet been resolved by the medical community. . . . At best, we can only find that the evidence offered by the parties is inconclusive and in equipoise, insufficient to satisfy the employer's burden.

The record supports the commission's finding that MWAA failed to rebut the presumption because it failed to prove that Lusby's disease was not caused by his employment.  "As the factfinder, the commission is charged with the responsibility of resolving questions of credibility and of controverted facts."  Virginia Employment Commission v. Gantt, 7 Va. App. 631, 635, 376 S.E.2d 808, 811 (1989).  Based on its review of the medical evidence, the commission credited and accepted as more persuasive the testimony of cardiologist Dr. Richard Schwartz, who directly attributed Lusby's heart disease to "occupational stress" and cardiologist Dr. Mahesh Shah, who specifically diagnosed Lusby's condition as "stress induced ischemia."  We are bound by the commission's findings if they are supported by

-

credible evidence.  Lynch v. Lee, 19 Va. App. 230, 234, 450 S.E.2d 391, 393 (1994).

The record also supports the commission's finding that the medical evidence upon which MWAA relied constituted "mere general denials" that coronary heart disease is work-related, see Medlin v. Co. of Henrico Police, 34 Va. App. 396, 542 S.E.2d 33 (2001), and did not rebut the "positive opinions" regarding causation given by Drs. Schwartz and Shah.  Although Dr. Seides denied any relationship between Lusby's position with MWAA and his CAD, he made clear that his opinion was based on general scientific principles.  He stated, "Any attempt to make this association [between Lusby's CAD and his employment at MWAA] is contrary to our current scientific understanding as to the genesis of this process."

Dr. Israel similarly observed that occupational stress did not cause Lusby's coronary heart disease.  He explained the basis of his opinion by referencing the inability of the medical community to establish a causative relationship between occupational stress and heart disease.  On that ground, he concluded there was no relationship in Lusby's case.

Finally, Dr. Holland stated in conclusory fashion that Lusby's employment did not cause his coronary artery disease. He subsequently explained the basis of his conclusion, stating that the cause of CAD, which results from atherosclerosis, is unknown and that non-work-related risk factors present in

-

Lusby's medical history caused his CAD.  He more specifically explained his opinion by reviewing the literature that addressed the potential of certain chemicals to cause cardiovascular disease.  Based on that review, he determined that none was a known agent of such disease.  His opinion did not address Lusby's exposure to smoke in the course of his employment, however, or the role occupational stress plays in generating the disease.  In short, Dr. Holland concluded that Lusby's CAD was not caused by his employment by restricting his review to the potential cardiotoxic effect of certain chemicals while ignoring the effect that smoke and the stress-related aspects of Lusby's job can have on cardiovascular health, which both Drs. Schwartz and Shah found causative.

The statements and opinions of Drs. Seides, Israel and Holland constitute general rebuttals of "the underlying premise [and legislatively enacted presumption] of the statute, which establishes a causal link between stress and heart disease."  As such, they are "not probative evidence for purposes of overcoming the presumption."  Medlin, 34 Va. App. at 407, 542 S.E.2d at 39.  "Where the General Assembly has concluded that there is a causal link between stress and heart disease, it is not for the commission or the courts to reconsider the issue, for to do so would defeat the intentions of the legislature."  Id.

-

MWAA nonetheless contends it proved Lusby's disease was not caused by his employment because the commission found that non-work-related risk factors, including obesity, diabetes, hypertension, elevated cholesterol, smoking history, and a generally sedentary life-style, caused his coronary artery disease.[7]  MWAA, in essence, reasons that proof of one prong of the Bass test, i.e. that non-work-related factors caused the CAD, at once establishes, or is necessarily encompassed within, the other, i.e. that Lusby's disease was not caused by his employment.  We disagree.

MWAA misapprehends the holding in Bass and the burden of proof it establishes.  In Bass, the Virginia Supreme Court expressly held that both prongs of the test must be proved, notwithstanding their seemingly corollary nature.  If the Supreme Court intended that proof of one prong necessarily proved the other, the Court would not have posited a two-prong test.

Finally, MWAA contends that our decision in Henrico Co. Div. of Fire v. Woody, 39 Va. App. 322, 572 S.E.2d 526 (2002), mandates a different result.  The holding in Woody is inapposite.  In Woody, we held that the commission, without weighing the evidence of causation, concluded that the employer

---

[7] Lusby does not dispute the commission's determination that non-work-related factors contributed to his coronary artery disease.

-

failed to rebut the statutory presumption.  We found that the commission based its conclusion solely on evidence that the claimant had been exposed to potentially causative disease factors in the work environment.  In the case at bar, the commission weighed the testimony given by all the physicians as well as other medical evidence, giving credence and weight to the opinions of Drs. Schwartz and Shah, and discounting the "general denials" in the opinions of Drs. Israel, Seides and Holland.  We find no error in that determination.

In summary, we find that the commission's conclusion that MWAA failed to rebut the statutory presumption set forth in Code § 65.2-402 was supported by credible evidence.

## II.  Refusal of Selective Employment and Marketing of Residual Capacity

MWAA next contends that the commission erred as a matter of law in finding that Lusby cured his refusal of selective employment.  It cites as grounds Lusby's failure to contact MWAA subsequent to his refusal and his decision to limit his annual income to less than $39,000 per year in order to avoid losing his pension benefits.  MWAA relies on the latter ground as well to support its contention that Lusby failed to reasonably market his earning capacity.  We find MWAA's arguments to be without merit.[8]

---

[8] Code § 65.2-510 governs the refusal and subsequent cure of selective employment.  The statute was amended in 1995 to allow for a "partial" cure.  It is clear from the full commission's

-

In deciding whether a claimant has cured a refusal of employment by obtaining other comparable employment, we examine the wage secured by the claimant in dissimilar work relative to the wage offered by the employer and refused by the claimant. See Virginia Wayside Furniture, Inc. v. Burnette, 17 Va. App. 74, 79, 435 S.E.2d 156, 160 (1993). The record establishes that the dispatcher position MWAA offered to and refused by Lusby paid $21,000 a year, or $403.85 per week. The commission determined that Lusby cured his refusal of selective service in January 1997, when he earned $620.50 per week, $216.65 more than the refused weekly wage. We find that, when Lusby earned wages from dissimilar employment that equaled or exceeded the average weekly wage of $403.85 he would have earned had he accepted the employment offered by MWAA, he cured his unjustified refusal of selective service and was entitled to benefits.[9]

In asserting that the wages were not comparable, MWAA consistently and erroneously uses as its basis for comparison a

opinion that it proceeded under the former statute, which was in effect at the time of Lusby's injury, because it does not contemplate or consider partial cure as a basis for recovery in this case.

[9] We note that, based on the record provided on appeal, Lusby cured his refusal of selective service in 1996, when his wages first exceeded the wage offered by MWAA. In 1996, Lusby earned $527.05 per week in his two part-time jobs and by January 1997, he earned $620.50 per week. However, because Lusby failed to preserve for appeal the full commission's decision for the March 1996 – January 1997 period, we do not address it on appeal, affirming only the commission's determination that a cure occurred in January 1997. See Rule 5A:18.

-

salary of $39,000.[10]  The flaw in MWAA's argument is fatal to its

position on appeal.  Neither the evidence, which establishes

that the refused wage was $21,000 per year or $403.85 per week,

nor the relevant law, which premises cure on a comparison of

present and refused wages, support the conclusions urged by

MWAA.  See id.[11]

MWAA also contends Lusby failed to establish that he

reasonably marketed his residual earning capacity.  Wall Street

Deli, Inc. v. O'Brien, 32 Va. App. 217, 220, 527 S.E.2d 451, 453

(2000); National Linen Service v. McGuinn, 8 Va. App. 267, 272,

380 S.E.2d 31, 34 (1989).  MWAA contends that Lusby consciously

limited his earnings from the two part-time positions he held

and reasons that his failure to earn more constitutes a failure

to reasonably market his residual earning capacity.  The

argument is not supported by either the evidence or the law.

---

[10] That figure, approximately 80% of his pre-injury salary,
reflects the amount Lusby could earn without losing his pension
benefits.

[11] The commission also erroneously used $39,000 as the base
line figure against which it compared the wages he earned from
his employment with Gold Line Bus Company and Calvert Memorial
Hospital in its determination of whether Lusby cured his refusal
of MWAA's employment offer and whether he reasonably marketed
his residual working capacity.  However, the error is immaterial
to our decision.  See Driscoll v. Commonwealth, 14 Va. App. 449,
452, 417 S.E.2d 312, 313 (1992) ("[A]n appellate court may
affirm the judgment of the trial court when it has reached the
right result for the wrong reason.").

-

"In general, an employee who has reached maximum medical improvement and remains partially disabled must make a reasonable effort to market his remaining capacity to work in order to continue receiving workers' compensation benefits." Burnette, 17 Va. App. at 78, 435 S.E.2d at 159 (citing McGuinn, 8 Va. App. at 269, 380 S.E.2d at 33). "The determination of whether a partially disabled employee has adequately marketed his residual work capacity lies within the factfinding judgment of the commission, and its decision on that question, if supported by credible evidence, will not be disturbed on appeal." O'Brien, 32 Va. App. at 220-21, 527 S.E.2d at 453. Whether an employee has made a reasonable effort to market his remaining work capacity is determined by an objective standard of reasonableness and depends on the particular circumstances of each situation. McGuinn, 8 Va. App. at 270-72, 380 S.E.2d at 33-34.

In McGuinn, this Court examined the criteria that may be applied in determining whether an individual has reasonably marketed residual earning capacity. Citing to a decision in our sister state of Maine, we said,

> [I]n defining what would be considered a reasonable effort at obtaining employment . . . the employee must present "some evidence that he had engaged in a good faith effort to obtain work within the tolerance of his physical condition" and has failed to find a job, either due to his injury or because no such work was available in the community.

-

Id. at 271, 380 S.E.2d at 34 (quoting Dunkin Donuts of America, Inc. v. Watson, 366 A.2d 1121 (Me. 1976)).

Under the holding in McGuinn, the following factors may be considered to determine whether a claimant has reasonably marketed his residual capacity: (1) the nature and extent of employee's disability; (2) the employee's training, age, experience, and education; (3) the nature and extent of employee's job search; (4) the employee's intent in conducting his job search; (5) the availability of jobs in the area suitable for the employee, considering his disability; and (6) any other matter affecting employee's capacity to find suitable employment. Id. at 272, 380 S.E.2d at 34.

We subsequently established another factor that is appropriately considered in determining whether a claimant has reasonably marketed residual earning capacity. See Burnette, 17 Va. App. at 79, 435 S.E.2d at 160. The Burnette Court held that, when a claimant is willing to accept a position that pays a wage "comparable" to that which he would have earned had he accepted the selective employment offered, he has both cured the unjustified refusal of selective employment and marketed his residual capacity. Id.

In Burnette, the claimant was offered a job with a beginning wage of $3.85 per hour for a two-week training period, after which they would increase his wage to $5.00 to $ 5.50 per hour. He refused the position and later found a job that paid

-

$5.45 per hour.  In determining that the claimant cured his unjustified refusal of selective employment, we stated, "the wage that [claimant] now earns . . . falls within the mid-range of the projected starting wage [of the refused job] . . . . Thus, by obtaining employment at a wage that is comparable to that which was offered him, he has cured his unjustified refusal of the selective employment that was offered him."  Id. at 79-80, 435 S.E.2d at 160.  We further stated, "[T]he commission did not err in finding that [claimant] had cured his prior unjustified refusal of the suitable employment by obtaining comparable employment and, thereby, had marketed or made a reasonable effort to market his residual capacity."  Id. at 79, 435 S.E.2d at 160.  In short, in such cases the conduct establishing that a claimant has cured an unjustified refusal of employment and has reasonably marketed his residual capacity, are coincident.

The commission determined that Lusby reasonably marketed his residual work capacity on January 7, 1997, the date on which he cured his unjustifiable refusal of MWAA's proffered employment.  We find the commission's decision is supported by credible evidence and is controlled by our decision in Burnette. The evidence establishes that Lusby's income from dissimilar employment in January 1997 exceeded by several hundred dollars the weekly wage he would have earned by accepting the position offered by MWAA.

-

Contrary to MWAA's contention, Lusby's failure to contact MWAA for other available positions or to inquire about positions with other employers,[12] and his decision to limit his earnings from dissimilar employment to preserve his retirement benefits, are of no significance. See Greif Companies v. Sipe, 16 Va. App. 709, 715, 434 S.E.2d 314, 318 (1993) ("What constitutes a reasonable marketing effort depends on the facts and circumstances of each case."). Evidence that other positions were available to him is notably lacking in the record. Moreover, as a matter of law, Lusby was required to earn wages comparable to those he would have enjoyed had he accepted MWAA's proffered employment to entitle him to compensation and nothing more. See Burnette, 17 Va. App. at 79, 435 S.E.2d at 160. Here, Lusby's earnings were significantly greater than those he would have earned in employment offered by MWAA in a position that was expected to be of limited duration. Under these facts, it cannot be said that Lusby's decision to limit his inquiries to MWAA regarding other positions, to limit his job search to one application with another fire department and to limit his earnings from dissimilar employment constituted a failure to reasonably market his residual earning capacity. Thus, we affirm the commission's decision that Lusby cured his refusal of light-duty work.

_____

[12] Lusby applied for one job, with the Alexandria Fire Department, but he was not hired.

-

<u>Conclusion</u>

We hold that the commission did not err in 1) finding that Lusby's cardiovascular disease is attributable to his employment, 2) in applying the law applicable to determining causation, 3) in awarding continued disability benefits based upon income that Lusby voluntarily limited, or 4) in finding that Lusby had cured his unjustified refusal to work and had reasonably marketed his residual capacity.  Accordingly, we affirm.

<u>Affirmed.</u>