**Salem**

ARMSTRONG FURNITURE, et al.

v.

SANDRA MARTIN ELDER

No. 0784-86

Decided May 19, 1987

COUNSEL

James C. Joyce, Jr. (Gentry, Locke, Rakes and Moore, on brief), for appellants.

Gary L. Lumsden, for appellee.

OPINION

**KOONTZ, C.J.** — Armstrong Furniture and its insurer, Liberty Mutual Fire Insurance Co., (appellants) appeal a decision of the Industrial Commission awarding Sandra Martin Elder (appellee) weekly disability benefits pursuant to Code § 65.1-99 based on a

change in condition. Appellants argue that: (1) Elder's claim for temporary total disability payments was time-barred by Code § 65.1-56; and (2) appellants are not liable for Elder's alleged disability because she unjustifiably refused selective employment offered by Armstrong for a reason unconnected with the compensable injury. For the reasons stated below, we affirm.

## I. Statute of Limitations Issue[1]

Elder suffered a compensable injury on December 15, 1980, while employed by Armstrong, when a machine blade severely lacerated her left hand, cutting the extensor tendons in four fingers and crushing her forearm. Elder received temporary total compensation for thirty-two and one-half weeks until she returned to selective employment. She remained at Armstrong in a selective capacity for twenty-two months until she was discharged in October 1982.

After a determination that Elder's hand and arm had reached maximum recovery, she and Armstrong agreed pursuant to Code § 65.1-56 to an award for eighty-two weeks of compensation for permanent partial disability. This award covered the period from August 24, 1982 to March 19, 1984, and was based on a five percent loss of use of the left arm and a forty-eight percent loss of use of the left hand.

Following her discharge from Armstrong in October 1982, Elder was continuously employed in several positions. She asserts that all of these jobs terminated because of problems related to her left arm and hand and that since December 1985 she has been self-employed in order to accommodate her health problems.

On December 4, 1985, Elder applied to the commission for a hearing, alleging that based on a change in condition she was entitled to additional temporary total compensation pursuant to Code § 65.1-99. She alleged that the change in condition was the deterioration of her medical condition. In his opinion of March 12, 1986, Deputy Commissioner Yates found that Elder met her burden of proving a change in condition and awarded her temporary total disability payments beginning September 4, 1985.

---

[1] For clarity, the germane facts are recounted in the discussion of the issue to which they relate.

Armstrong filed an application for review and a hearing before the full commission. In its opinion of June 13, 1986, the commission affirmed the award.

At issue here is whether Code § 65.1-56 or Code § 65.1-99 applies to Elder's application for additional compensation. Code § 65.1-56 is the section under which Elder originally received compensation for permanent partial disability from August 24, 1982 until March 19, 1984. That section provides in pertinent part:

In cases included by the following schedule the incapacity in each case shall be deemed to continue for the period specified and the compensation so paid for such injury shall be as specified therein and shall be in lieu of all other compensation. After compensation has been paid as provided herein, the employee may within one year from the date compensation was last due under this section file an application for compensation for incapacity to work . . . .

Code § 65.1-99 provides in pertinent part:

Upon its own motion or upon the application of any party in interest, on the ground of a change in condition, the Industrial Commission may review any award and on such review may make an award ending, diminishing or increasing the compensation previously awarded . . . . No such review shall be made after twenty-four months from the last day for which compensation was paid . . . .

■ Code § 65.1-99 is not a statute of limitations in the ordinary sense. It does not provide that a claimant has twenty-four months from the date the change in condition occurred to file; but instead, it provides that the change in condition must occur within twenty-four months from the date compensation was last due or paid. In the instant case, the date compensation was last due or paid was March 19, 1984.

If Code § 65.1-56 applies, as appellants argue, the period for filing an additional claim ended on March 19, 1985, nearly nine months before Elder applied for a review. If, however, as Elder argues, Code § 65.1-99 applies, the period for filing did not expire

until March 19, 1986, some four months after Elder applied for a review.

Appellants argue that Code § 65.1-56 applies to filing an application for compensation following the termination of an award for permanent partial disability. Appellants cite the statutory definition of "change in condition" in support of this argument. Code § 65.1-8 defines "change in condition" as "a change in physical condition of the employee as well as any change in the conditions under which compensation was awarded or terminated which would affect the right to, amount of, or duration of compensation." Thus, appellants contend that a "change in condition" contemplates not only a physical change, but it also includes changed circumstances. Taken to its logical conclusion, cessation of payments of a Code § 65.1-56 award would constitute a "change in the conditions under which compensation was awarded" which would trigger the two year limitation period of Code § 65.1-99. Thus, appellants argue that the two year limitation period of Code § 65.1-99 would virtually swallow the one year limitation period of Code § 65.1-56, rendering it a nullity. Because no statute should be interpreted in a way which would render another statute superfluous, appellants argue that Code § 65.1-56 must be strictly construed to mean that a one year limitation period applies to the filing of an application for compensation at the end of an award for permanent partial disability pursuant to Code § 65.1-56.

On the other hand, Elder argues that the proper inquiry is simply whether there has been a "change in condition" or an "incapacity to work" at the time payments cease. If a "change in condition" can be shown, then the two year limitation period of Code § 65.1-99 applies. If there has been no change in condition but instead a continued "incapacity to work," then the one year limitation period of Code § 65.1-56 applies. We agree.

Code § 65.1-56 allows for compensation for permanent partial incapacity to work for a period of time specified by statute. Upon expiration of that time period, the claimant may file an application for additional compensation within one year from the date compensation was last due. Thus, the one year limitation period of Code § 65.1-56 is triggered not only by a cessation of payments, but also by a continued incapacity to work. If on March 19, 1984, when her compensation ceased, Elder was still suffering from a forty-eight percent loss of use of her left hand and a five

percent loss of use of her left arm, but otherwise her condition had neither deteriorated nor improved, nor had any related conditions under which the award was made changed, then under Code § 65.1-56 Elder had until March 19, 1985 to apply for additional compensation for incapacity to work, subject to the provisions of §§ 65.1-54 and 65.1-55.

■ On the other hand, Code § 65.1-99 is triggered by a "change in condition." That change can be in the physical condition of the employee as well as a change in the conditions under which the compensation was awarded. Code § 65.1-8. These changes include "progression, deterioration, or aggravation of the compensable condition . . . appearance of new or more serious features [and] failure to recover within the time originally predicted . . . ." 3 A. Larson, The Law of Workmen's Compensation § 81.31(a) (1983). An application for review under Code § 65.1-99 must be made within two years from the last date for which compensation was paid.

We hold that Code §65.1-99 is the controlling statute in this case. The overwhelming medical evidence presented by Elder established that the mobility and range of use in her left arm and hand seriously deteriorated after the original award, thus establishing a physical change in condition. Not only did Elder suffer from a continuing disability from the original injury on the date compensation was last due in March 1984, she also suffered a deterioration in her condition after she and Armstrong agreed to the award in September 1982. The progress notes of her treating physician, Dr. Jay E. Hopkins, indicate as early as November 1982 that Elder was suffering from increased left shoulder pain. His notes of February and April 1983 indicate muscle pain in this area for which Elder was given systemic steroid injections. During the summer of 1984, Elder was also treated by Dr. G. Poehling of the Bowman Gray School of Medicine who performed repeat web z-plasty of her left hand. He noted on July 24, 1984, that Elder had received prolonged treatment without significant effect. He noted that some surgery would be helpful mechanically but would restrict movement. In May, 1985, he recommended cervical traction for the spasms that Elder was experiencing. He again noted on June 24, 1985, that she was suffering from gradually increasing pain and stiffness in her shoulder and hand and the base of her neck which resulted in decreased mobility. Dr. Charles R. Jo-

seph, a neurosurgeon, also examined Elder and on July 8, 1985, diagnosed her condition as "sympathetic dystrophy: left hand tingling and numbness." He attributed this condition to the 1980 injury. During the summer of 1985, Elder underwent a series of left stellate ganglion blocks to relieve problems with a frozen left shoulder, left thumb, and little finger. Notes of a treating physical therapist of November 22, 1985, stated that the flexibility in her left hand, arm and shoulder had decreased dramatically during her treatment and that she suffered from "significant atrophy" in the wrist and forearm. On October 22, 1985, Dr. Poehling recommended that a sympathectomy be done.

Based on this evidence, we agree with the commission that Elder's condition deteriorated subsequent to the time that she and Armstrong entered into the award pursuant to Code § 65.1-56. Thus, we conclude that Elder's condition on December 4, 1985, was significantly different from that in August and September 1982 when she agreed to the award for permanent partial disability.

■ We hold that the two year limitation period of Code § 65.1-99 applies to filing an application for additional workers' compensation benefits pursuant to a change in condition as defined by Code § 65.1-8. Conversely, the one year limitation period of Code § 65.1-56 applies to filing an application for additional workers' compensation benefits in a situation when the disability is at the same level both when the award begins and ends. Thus, the limitation period of Code § 65.1-56 is triggered by a cessation of payments and a continued incapacity to work. In this case, however, not only had Elder's compensation benefits ceased, but her condition had significantly deteriorated. Accordingly, we hold that Elder properly and timely filed her application for additional workers' compensation benefits under Code § 65.1-99.

We also conclude that a cessation of payments of a § 65.1-56 award is not, standing alone, a "change in the conditions under which compensation was awarded or terminated which would affect the right to, amount of, or duration of compensation" which would trigger Code § 65.1-99. In this case the award was made pursuant to Code § 65.1-56 and was agreed to by the claimant and the employer and the dates on which the compensation would begin and end were also agreed to by the parties at the time of the award. By statute, "the incapacity in each case shall be deemed to

continue for the period specified . . . ." Thus, the agreed upon termination date for such compensation cannot be a "change in the [condition] under which compensation was awarded or terminated" since all parties concerned knew when the payments would cease. Accordingly, the cessation of payments on March 19, 1984, was not a "change in condition." Both Elder and Armstrong knew in September 1982 when they agreed to the award that the compensation would cease on March 19, 1984.

## II. Refusal of Selective Employment

Appellants also argue that Elder is not entitled to receive compensation because she unjustifiably refused selective employment in Armstrong's finishing room and subsequently accepted work at a lower wage. Armstrong argues that Elder would have suffered no loss of wages had she remained in a selective capacity at Armstrong. Thus, appellants contend that Elder effectively broke the causal connection between the original compensable injury and her current alleged change in condition by unjustifiably refusing selective employment. However, the commission found and we agree that the evidence showed that Elder did not unjustifiably refuse selective employment.

The record reveals that during the period of selective employment, Elder performed several jobs for Armstrong and experienced difficulty with all of them. In March 1981 before she returned to work, her treating physician, Dr. H. D. Von Oesen, advised that she could return to light duty work using her right hand only. He suggested simple typing, answering the phone, and filing as appropriate job activities. Elder stated that during her selective employment, she stacked boards weighing from five to seven pounds and she also sorted screws. She stated that her left hand swelled so that it was stiff and inflexible. She also experienced spasms and numbness in her hand. Her shoulder and arm also caused her much pain. She stated that she was required to work around belts, exposed gears, and a 200 degree hot melt glue gun. The final position she held at Armstrong involved working in the finishing room, wiping lacquer from furniture with her right hand. Elder claimed the fumes in the finishing room made her ill. She was given a respirator to wear, although she did not do so consistently because she felt it did not help. There was no job requirement that she wear a respirator. Both her supervisor and the

Armstrong Safety and Training Manager testified that the respirator worked properly.

Elder testified that she could perform this job, but it caused her pain and swelling in her left hand. She stated that the fumes were not the only reason she could not do the job, but "that problem brought the whole thing to a head." Dr. Hopkins' progress notes of November 9, 1981 stated: "Her hand tends to swell up severely with work." On August 17, 1982, Dr. Hopkins noted that Elder lasted less than one day on the "hot melt job." He recommended sorting screws as an alternative. Between Elder's visits of September 19 and September 28, 1982, Dr. Hopkins noted: "Edge trimming - swelling - problems with finishing room - hospital - one week - unable to work much." After working in the finishing room for several days, Elder was admitted to Lynchburg General Hospital on September 10, 1982, for "chest pains" and "embolus."

Dr. Hopkins' progress notes of September 28, 1982, noted that "[R]epeated manipulations[,] fine movement, twisting, grasping, and persistent hanging down of the left upper extremity is going to cause her trouble." Subsequent to her hospitalization, Elder returned to work in the finishing room. She was, however, forced to leave early for several days after becoming ill from the fumes in the room. Subsequently, she was discharged in early October 1982, because she had trouble working around solvents.

The commission found that Elder was unable to successfully master any of the jobs she was given during the twenty-two month period of selective employment. Although Armstrong argued that the real reason Elder could not master the finishing room job was because of the fumes, the record supports the commission's conclusion that other factors made this a difficult job for her. Elder stated that although this job was designed for her right hand, "it helped to hold things in my left hand, but I couldn't for more than a couple of minutes . . . ." She stated that in addition to this she experienced problems with the fumes in the finishing room. This led to the hospitalization on September 10, 1982, after which she voluntarily returned to the finishing room.

Dr. Hopkins, the treating physician, prescribed the following job limitations on September 28, 1982: "If further employment is feasible should be job for one hand without using left hand for assistance. Should not have to use left hand for repetitive lifting or

grasping or continue to dangle. *Left hand should be elevated.*" (emphasis added). Thus, even wiping the lacquer from the furniture with her right hand would have been difficult for Elder as her left hand needed to be elevated. Further, the record reveals that Elder voluntarily returned to the finishing room after her hospitalization and was discharged by Armstrong ostensibly because she could not work around solvents.

■ Upon well established principles we note: "Upon appellate review, this Court will uphold findings of fact made by the Commission when supported by credible evidence." *Dublin Garment Co. v. Jones*, 2 Va. App. 165, 167, 342 S.E.2d 638, 638 (1986) (citations omitted). Accordingly, we affirm the commission's finding that "claimant was not ready for selective employment, and she did not unjustifiably refuse selective employment with the employer." Thus, Elder did not break the causal connection between the original compensable injury and her current disability claim.

In summary, we hold that Elder timely filed an application for additional compensation pursuant to a change in condition under Code § 65.1-99. Further, because there is credible evidence to support the commission's finding that Elder did not unjustifiably refuse selective employment, we affirm the decision of the commission.

Accordingly, the decision appealed from is affirmed.

*Affirmed.*

Coleman, J., and Moon, J., concurred.