COURT OF APPEALS OF VIRGINIA


Present:   Judges Powell, Alston and Senior Judge Annunziata
Argued by teleconference


ATLAS VAN LINES AND
  LEGION INSURANCE COMPANY

                                            MEMORANDUM OPINION[*] BY
v.        Record No. 1345-10-4             JUDGE ROSSIE D. ALSTON, JR.
                                                  APRIL 12, 2011
EDWARD J. KERR


             FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

        Andrew M. Alexander (Semmes, Bowen & Semmes, on briefs), for
        appellants.

        Peter J. Jones for appellee.


        Atlas Van Lines and Legion Insurance Company (employer) appeal a majority decision

of the Workers' Compensation Commission (the commission) awarding Edward J. Kerr

(claimant) varying amounts of temporary partial disability benefits.  Employer argues that the

commission erred in finding that (1) claimant's claim was a change-in-condition application

pursuant to Code § 65.2-708, rather than an application filed pursuant to Code § 65.2-501;

(2) claimant made reasonable efforts to market his residual work capacity; and (3) claimant was

partially disabled as a result of his work injury.  For the reasons stated below, we affirm.

                                    I.  BACKGROUND

        Claimant and his wife worked together in the moving business for many years.  Both

before and after claimant's injuries in 2000, he worked in partnership with his wife as the owners

and operators of a moving company that performed residential and commercial moves

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

exclusively for employer. The moving jobs required claimant and his wife to pack, load, deliver, unload, and unpack residential and commercial property for employer's clients. On June 19, 2000, claimant suffered a compensable injury to his back. Two days later, he suffered injuries to his back and right ankle, found to be compensable consequences of the June 19, 2000 injury.

As a result of these injuries, claimant was awarded various periods of temporary total disability benefits, temporary partial disability benefits, and permanent partial disability benefits. In 2003, a deputy commissioner of the commission determined claimant's pre-injury average weekly wage was $1,078.60. The deputy commissioner determined claimant's average weekly wage by dividing in half the profits of his partnership with his wife. In 2004, the full commission affirmed the deputy commissioner's decision. It further ruled that claimant's temporary partial disability benefits were to be determined quarterly and adjustments in claimant's temporary disability benefits would be made within 30 days of the end of each quarter.

During the years following the 2000 accident, claimant continued to work as a mover and received specialized care for his injuries. Dr. Steven Hughes treated claimant's back injury, and Dr. Stephen Neufeld treated claimant's ankle injury. In 2001, Dr. Hughes performed a number of procedures on claimant, and in May 2001, he released claimant to return to modified duty with no lifting of more than 30 pounds on a frequent basis; breaks of 15 to 30 minutes every 2 hours while driving; and no pushing or pulling more than 30 pounds. In February 2002, Dr. Hughes opined that claimant had reached maximum medical improvement. The following year, he opined that the May 2001 restrictions were permanent.

Dr. Neufeld operated on claimant in December 2003, and in May 2004, he released claimant to full duties without restrictions, although he suggested that claimant use custom orthotics to relieve the stress on his foot and ankle. In July 2006, Dr. Neufeld again examined

- 2 -

claimant, and the following month, he stated that claimant could return to his pre-injury job as a driver without limitations on driving. In October 2006, he re-evaluated claimant and diagnosed synovitis and anterior lateral impingement syndrome and an osteochondral defect in the talar dome of the right foot. He prescribed a brace for claimant's ankle.

On May 4, 2006, Dr. John Bruno examined claimant. He opined that claimant suffered a 5% permanent impairment of the lower left extremity and a 22% permanent impairment of the lower right extremity. Dr. Bruno noted, "There is no history of any related problem."

On September 7, 2006, and October 10, 2006, Dr. Hughes again treated claimant for his back injury. In his September 2006 report, Dr. Hughes noted, "No prior similar injuries, motor vehicle accidents or workers compensation claims have been reported. [Claimant] states he is [not] capable of working at this time but would be able to work with restrictions and moderations." Additionally, Dr. Hughes noted claimant's past surgeries: "Status Post L4-S1 Diskectomy; Hernia Repair in 01/03; Ankle surgery in 01/04." In the October 2006 report, Dr. Hughes reiterated the restrictions he placed on claimant in May 2001. He opined that claimant had reached maximum medical improvement and stated that no further diagnostic or treatment options would be "pursued as they are unlikely to alter [the] ultimate outcome or be health beneficial." Dr. Hughes further stated, "The patient has elected to proceed with palliative measures only for symptomatic management. The goal of this treatment plan is to limit the severity of recurrent episodes of pain and disability." In a November 2006 follow-up medical questionnaire, Dr. Hughes stated that claimant's restrictions were caused by the back injuries claimant sustained in the 2000 industrial accident and that claimant's injuries were permanent.

On February 9, 2007, the commission entered a stipulated order, awarding claimant permanent partial disability benefits for impairment to the right lower extremity and left lower extremity. On March 6, 2007, the commission entered an amended stipulated order, awarding

"38.5 weeks of permanent partial disability benefits at the rate of $567.00 per week beginning July 6, 2006, for [claimant's] right lower extremity permanent partial impairment" and "8.75 weeks of permanent partial disability benefits at the rate of $567.00 per week beginning May 4, 2006 for [claimant's] left lower extremity permanent partial impairment."

On July 17, 2007, claimant filed a claim for temporary partial disability benefits for the first quarter of 2007, which ended March 31, 2007. On September 19 and 20, 2007, Deputy Commissioner Colville conducted a two-day hearing regarding this claim. During this hearing, claimant and his wife both testified that claimant could not earn as much money post-injury due to his driving restrictions; however, claimant also admitted that he had driven longer hours in violation of the restrictions placed on him by Dr. Hughes. Deputy Commissioner Colville issued his opinion on October 31, 2007. He awarded claimant temporary partial disability benefits for the period spanning January 24, 2007, to March 31, 2007, over employer's objection. This decision was later reversed by the full commission in March 2008. The commission found that the first quarter of the year was typically a less lucrative quarter for the moving industry and claimant failed to look for another job during that period to supplement his earnings from employer. According to the commission, this failure to market his work capacity precluded claimant from receiving an award of temporary partial disability benefits.

The commission subsequently vacated its March 2008 opinion at claimant's request. On July 22, 2008, the commission issued a new opinion. It again reversed the deputy commissioner's October 31, 2007 award of temporary partial disability benefits for the period spanning January 24, 2007, to March 31, 2007, finding that claimant failed to prove he adequately marketed his residual work capacity.

Between January 1, 2008, and February 18, 2008, claimant earned an average weekly wage of $561.71 while working for employer. On February 18, 2008, claimant stopped working

- 4 -

for employer because he had found new employment with E. F. Thompson, a trucking company that hauled mail for the United States Postal Service; however, claimant was not able to begin working for E. F. Thompson until March 15, 2008. Claimant testified that he sought new employment because the work offered by employer was not always steady from month to month and it was physically strenuous. According to claimant, E. F. Thompson offered him an opportunity that did not require him to drive long distances, nor did the new job opportunity require him to spend as much time packing, lifting, and loading shipments.

On April 4, 2008, claimant filed a claim for temporary total disability benefits from the period commencing on January 4, 2008. This claim was later amended to request temporary partial disability benefits for the period between January 1, 2008, and February 18, 2008. He subsequently filed additional claims for other time quarters as well.

Claimant was working for E. F. Thompson in March 2009 when he was unable to work due to back pain for ten days spanning March 9, 2009, to March 19, 2009. He attempted to obtain medical treatment, but he did not receive authorization from his insurance carrier to see Dr. Hughes for five weeks.

On April 10, 2009, an evidentiary hearing regarding claimant's claims, including the April 4, 2008 claim, was held before Deputy Commissioner Colville. These claims, some of which were amended prior to the hearing, were as follows: temporary partial disability benefits from January 1 through February 18, 2008, based upon an average weekly wage of $561.71; temporary total benefits from February 19 through March 14, 2008; and intermittent temporary partial benefits from March 15 through June 15, 2008; June 30 through July 13, 2008; July 28 through August 24, 2008; September 8 through October 5, 2008; November 3 through November 16, 2008; December 15 through December 28, 2008; and January 12, 2009 and continuing. All

of these claims were filed more than one year, but less than two years, after claimant received his last disability benefit under the March 6, 2007 amended stipulated order.[1]

At this hearing, claimant testified that he was 58 years old and had attended college for three and one half years. He stated that he had worked as a truck driver for the last 38 years. He testified that over the last 2 years, his back and ankle conditions had become progressively worse and that he had to take 10 days off of work in March 2009. Claimant testified that he had seen Dr. Hughes on April 4, 2009, and that Dr. Hughes prescribed him pain medication and 4 weeks of physical therapy. Claimant did not submit a medical record from this visit at the hearing.

Claimant also testified regarding his employment. Critical to the ultimate resolution of the case, claimant testified that he worked approximately the same number of hours per week before and after his injury. He presented evidence that in 1999, the last full year prior to his injury, he and his wife's net profit was $101,702, compared with a net profit of $67,960.50 in 2007, the last full year claimant worked for employer. He further presented evidence that he and his wife grossed $25,000 more in 1999 than they did in 2007 and their labor costs were $12,000 less in 1999 than they were in 2007. He explained that the labor costs increased because he had to hire more laborers to help him with his job responsibilities, due to the restrictions on his activities following the injuries and surgeries. He also stated that the cost of hiring qualified laborers increased from 1999 to 2007. Furthermore, claimant specifically testified that during the second quarter of 2007, he "had to pay more labor and hire more labor to do the job." This quarter directly followed the March 6, 2007 amended stipulated order.

In 2007, claimant's last full year of his business, claimant claimed he earned $33,960.50 for the year (or 50% of his and his wife's net profit of $67,921), or a weekly wage of $653.08.

---

[1] On brief, claimant argued that the claims were filed within one year of the last payment of disability benefits; however, claimant conceded at oral argument that the claim was filed more than one year after claimant received the last payment.

There was evidence that claimant made one employment contact in the last quarter of 2007; however claimant testified that he began looking for alternative employment in January 2008, due to the decreased profitability of his and wife's business. He stated that working with his wife was no longer profitable due to their higher labor costs and his inability to perform more lucrative long distance hauling jobs that his driving restrictions precluded him from completing. He further testified that before Christmas 2007, he picked up a shipment for a client at employer's request, but for reasons out of his control, he could not deliver that shipment until February.[2] During that time period, claimant wanted to work on other jobs, but because of his involvement with the Christmas shipment assigned to him by employer, he was unable to perform other shipping jobs. He maintained that if he was making another delivery, he would have a conflict when employer asked him to deliver the Christmas shipment. While claimant waited for employer to assign him to other jobs, his average weekly wage was $561.71.

Claimant submitted evidence that he had contacted nine potential employers in the period spanning January 1, 2008, to February 18, 2008, in an effort to find more profitable employment.

As previously noted, claimant quit his moving business on February 18, 2008, and began working for E. F. Thompson on March 15, 2008. Claimant had no set schedule with E. F. Thompson. He testified at the hearing before the deputy commissioner that he was "on call" and that he called the company daily to determine whether his services were required. His earnings with E. F. Thompson for the 52 weeks after March 15, 2008, reflected a yearly salary of $41,806.78, and for 14 weeks of the year, he earned in excess of his pre-injury weekly wage of $1,078.50. His average weekly wage was $803.98, or $150.90 more per week than he earned the last year he worked for employer.

---

[2] Claimant testified that the client was a personal friend of the owner of employer. He further stated that the delay was caused by the client's difficulty in gaining access to his new home.

The evidence in the hearing also indicated that state regulations prohibit movers from working more than 70 hours per week. On average, claimant worked about 42.6 hours per week. Once he worked 58 hours in one week. He stated that he usually worked 3 to 4 days per week, because working more days would cause him to violate the state regulations. The evidence showed that he spent more hours driving and fewer hours packing, loading, and unloading at his job with E. F. Thompson than he did while he was working for employer.

The deputy commissioner issued an opinion on June 29, 2009, and the commission, in a decision, subsequently affirmed the deputy commissioner's decision. The commission found that claimant remained partially disabled as a result of the 2000 workplace injury. It denied claimant's claim for benefits for the first quarter of 2007, on the basis that the commission found in its July 2008 opinion that claimant had failed to market his residual work capacity during the typically slow period of his business. The commission further awarded claimant temporary partial disability benefits for the period between January 1, 2008, and February 18, 2008. The commission found that because claimant had contacted potential employers in January 2008, he had reasonably marketed his residual capacity. It further found that it was reasonable for claimant and his wife to end their partnership and stop working for employer, because the commission, in a March 2007 opinion not at issue in the instant appeal, had faulted claimant for failing to find additional work in the first quarter of 2007. The commission determined in the March 2007 opinion that claimant failed to prove that his wage loss was related to his injury, "rather than the predictable cycle of the moving business." The commission agreed with the deputy commissioner's finding that "the claimant took the completely reasonable step of trying to find employment wherein the highs and lows would not be as extreme and wherein he could count on a steady paycheck." The commission concluded, "In other words, the claimant did what the Commission told him to do in its previous [March 2007] decision."

Finally, the commission held that claimant filed his April 4, 2008 claim pursuant to Code § 65.2-708 on the grounds that claimant experienced an economic change in condition. The commission found that the seasonal low in the moving business, which decreased claimant's income, constituted an economic change under Code § 65.2-708.

Commissioner Williams dissented, finding that claimant had not proved a physical change in condition and therefore claimant necessarily filed his claim pursuant to Code § 65.2-501. According to Commissioner Williams, Code § 65.2-501 requires that claims be filed within one year of the last disability payment, and claimant had filed his claim more than one year from the last payment. Thus, Commissioner Williams believed the claim was time-barred.

Employer subsequently appealed the commission's decision to this Court.

## II. ANALYSIS

The fundamental purpose of the Virginia Workers' Compensation Act (the Act) is to give compensation for accidental injuries arising out of and in the course of employment without regard to fault. Lawrence J. Pascal, Virginia Workers' Compensation: Law and Practice, 1-3 (3d ed. 2000). "'It is as essential to industry as it is to labor.'" Id. (quoting Feitig v. Chalkley, 185 Va. 96, 98, 38 S.E.2d 73, 73 (1946)). "It extends the employer's liability to all accidental personal injuries 'arising out of and in the course of the employment.'" Id. (quoting Feitig, 185 Va. at 98, 38 S.E.2d at 73). Although workers' compensation should not require that every claim asserted be allowed, the Act was enacted for the purpose of attaining a humanitarian and beneficent purpose and is highly remedial and to be liberally construed in the favor of the worker. See Humphries v. Newport News Shipbuilding & Dry Dock Co., 183 Va. 466, 479, 32 S.E.2d 689, 695 (1945); Gobble v. Clinch Valley Lumber Co., 141 Va. 303, 305, 127 S.E. 175, 176 (1925); see also Corporate Res. Mgmt. Inc. v. Southers, 51 Va. App. 118, 126, 655 S.E.2d 34, 38 (2008) (*en banc*).

On appeal, we construe the evidence in the light most favorable to the party prevailing below. R. G. Moore Bldg. Corp. v. Mullins, 10 Va. App. 211, 212, 390 S.E.2d 788, 788 (1990). In an application for review of an award on the ground of a change in condition, the claimant bears the burden of proving his allegations by a preponderance of the evidence. J.A. Jones Constr. Co. v. Martin, 198 Va. 370, 373, 94 S.E.2d 202, 204 (1956). "Upon appellate review, this Court will uphold findings of fact made by the [c]ommission when supported by credible evidence." Dublin Garment Co. v. Jones, 2 Va. App. 165, 167, 342 S.E.2d 638, 638 (1986) (citing Richmond Cold Storage Co. v. Burton, 1 Va. App. 106, 111, 335 S.E.2d 847, 850 (1985)).

> The fact that there is contrary evidence in the record is of no consequence if there is credible evidence to support the commission's finding. In determining whether credible evidence exists, the appellate court does not retry the facts, reweigh the preponderance of the evidence, or make its own determination of the credibility of the witnesses.

Wagner Enters., Inc. v. Brooks, 12 Va. App. 890, 894, 407 S.E.2d 32, 35 (1991) (citations omitted). Issues regarding the application of the law to the factual findings of the commission are mixed questions of law and fact that are reviewed *de novo*. Roanoke Belt, Inc. v. Mroczkowski, 20 Va. App. 60, 68, 455 S.E.2d 267, 271 (1995).

## A. Code § 65.2-708 Change in Condition

On appeal, employer argues that the commission erred in awarding benefits to claimant under Code § 65.2-708.[3] Employer argues that claimant failed to prove a change in condition

---

[3] Claimant conceded at oral argument that the claim filed on April 4, 2008, for total disability benefits was filed more than one year after he last received benefits under the March 6, 2007 amended stipulated order. Therefore, claimant may not advance his claim under Code § 65.2-501, which does not require proof of a change in condition, because applications for compensation filed under Code § 65.2-501 must be filed "within one year from the date compensation was last due . . . ."

pursuant to Code §§ 65.2-708 and 65.2-101 and, therefore, claimant is not entitled to benefits.

Code § 65.2-708 states in pertinent part:

> A. Upon its own motion or upon the application of any party in interest, on the ground of a change in condition, the Commission may review any award and on such review may make an award ending, diminishing or increasing the compensation previously awarded, subject to the maximum or minimum provided in this title, and shall immediately send to the parties a copy of the award. . . . No such review shall be made after twenty-four months from the last day for which compensation was paid, pursuant to an award under this title . . . .
>
>     \*     \*     \*     \*     \*     \*     \*
>
> C. All wages paid, for a period not exceeding twenty-four consecutive months, to an employee (i) who is physically unable to return to his pre-injury work due to a compensable injury and (ii) who is provided work within his capacity at a wage equal to or greater than his pre-injury wage, shall be considered compensation.

Code § 65.2-101 defines "change of condition" under the Act as "a change in physical condition of the employee as well as any change in the conditions under which compensation was awarded, suspended, or terminated which would affect the right to, amount of, or duration of compensation."

In his claim for temporary partial benefits, claimant did not allege that his physical condition had changed since his last award of benefits; rather, he claimed that there was a change in the "conditions under which compensation was awarded, suspended, or terminated," pursuant to Code § 65.2-101. Claimant argues that since the March 2007 amended stipulated order was entered, he suffered an economic change in condition due to the following circumstances: he and his wife's moving business was less profitable due to their increased labor costs, his inability to take jobs that required him to travel far distances, and the slower speed at which he was capable of unloading the moving truck. These facts, along with the fluctuating nature of the moving business, instigated claimant's decision to close his moving business and seek less

- 11 -

physically strenuous employment with E. F. Thompson, a company that offered him a steadier paycheck from month to month.

Whether an economic change in condition may be considered a "change in condition" under Code §§ 65.2-101 and 65.2-708 is a question of first impression in Virginia. This Court has considered cases involving only allegations of changes of physical condition, rather than allegations of changes in economic conditions. See, e.g., Williams v. People's Life Ins. Co., 19 Va. App. 530, 534, 452 S.E.2d 881, 884 (1995) (holding that the claimant could not proceed under Code § 65.2-708 because the claimant's incapacity to return to gainful employment had not changed); Armstrong Furniture v. Elder, 4 Va. App. 238, 244, 356 S.E.2d 614, 617 (1987) (holding, in a case involving a claim of physical change, that Code § 65.1-56 (former Code § 65.2-501) applies "in a situation when the disability is at the same level both when the award begins and ends"). In those cases, this Court did not address whether an economic change could constitute a change in condition, as that question had not been presented on appeal. See Williams, 19 Va. App. 530, 452 S.E.2d 881; Armstrong Furniture, 4 Va. App. 238, 356 S.E.2d 614.

While this Court has not addressed the issue, the commission has considered cases involving economic conditions, and in those cases, it has specifically found that "'[a] change in economic conditions that cause lost earnings constitutes a change in condition under [Code] § 65.2-708, as long as the claimant was incapacitated because of his work injury from returning to his pre-injury employment.'" Nicolaisen-Carter v. FNC Holdings, Inc., No. 200-98-97, 2006 VA Wrk. Comp. LEXIS 567, at *6 (July 26, 2006) (quoting Fulks v. Combs Freightlines, Inc., No. 185-42-60 (Va. Workers' Comp. Comm'n Mar. 10, 2000)).

Recognizing that this Court is not bound by the decisions of the commission, it is acknowledged "[a]s a general rule, 'the construction afforded a statute by the public officials

charged with its administration and enforcement is entitled to be given weight by a court.'"

Cousar v. Peoples Drug Store, 26 Va. App. 740, 743, 496 S.E.2d 670, 672 (1998) (quoting

Lynch v. Lee, 19 Va. App. 230, 232, 450 S.E.2d 391, 392 (1994)). Nonetheless, "'this Court

should withhold deference . . . when the commission's statutory interpretation conflicts with the

language of the statute . . . .'" Id. (quoting Lynch, 19 Va. App. at 232-33, 450 S.E.2d at 393). In

the instant case, we do not find that the commission's interpretation conflicts with the language

of the statute, and thus defer to the commission's determination that an economic change may

constitute a change in condition.

"'It is well established that the primary objective of statutory construction is to ascertain

and give effect to legislative intent.'" Actuarial Benefits & Design Corp. v. Va. Emp't Comm'n,

23 Va. App. 640, 648, 478 S.E.2d 735, 739 (1996) (quoting Va. Emp't Comm'n v. Fitzgerald, 19

Va. App. 491, 495, 452 S.E.2d 692, 694 (1995)). "When the language in a statute is clear and

unambiguous, we are bound by the plain meaning of that language. We must determine the

General Assembly's intent from the words appearing in the statute, unless a literal construction

of the statute would yield an absurd result." Ratliff v. Carter Mach. Co., 39 Va. App. 586, 590,

575 S.E.2d 571, 573 (2003) (quoting Cummings v. Fulghum, 261 Va. 73, 77, 540 S.E.2d 494,

496 (2001); citing Peacock v. Browning Ferris, Inc., 38 Va. App. 241, 249, 563 S.E.2d 368, 372

(2002)). In keeping with these principles, "where possible, every word of a statute must be given

meaning." Gray v. Graves Mountain Lodge, Inc., 26 Va. App. 350, 356, 494 S.E.2d 866, 869

(1998) (citing Monument Assocs. v. Arlington Cnty. Bd., 242 Va. 145, 149, 408 S.E.2d 889, 891

(1991)).

Code § 65.2-101 defines a "change of condition" under the Act as "a change in physical

condition of the employee *as well as* any change in the conditions under which compensation

was awarded, suspended, or terminated which would affect the right to, amount of, or duration of

- 13 -

compensation." (Emphasis added). The phrase "as well as" is ordinarily accepted to mean "and in addition" or "in addition to." Merriam-Webster's Collegiate Dictionary 76 (11th ed. 2003). The plain meaning of this phrase dictates that the second clause, which begins "any change in the conditions under which compensation was awarded, suspended, or terminated . . ." must refer to something other than a change in physical condition. If only a change in physiological condition constituted a change in condition, as employer suggests, the phrase "as well as any change in the conditions under which compensation was awarded, suspended, or terminated . . ." would be meaningless. Thus, consistent with the determination of the commission, we hold that an economic change may, under appropriate factual circumstances, constitute a change in condition, as defined by Code § 65.2-101. This holding is in keeping with the principle that the provisions of the Act "should be liberally construed to carry out [its] humane and beneficial purposes," Baggett Transp. Co. v. Dillon, 219 Va. 633, 637, 248 S.E.2d 819, 822 (1978), as it construes the statutory language in favor of the claimant, see Humphries, 183 Va. at 479, 32 S.E.2d at 695; Gobble, 141 Va. at 305, 127 S.E. at 176.

Having found that a change in economic conditions may constitute a "change in the conditions under which compensation was awarded, suspended, or terminated which would affect the right to, amount of, or duration of compensation," pursuant to Code § 65.2-101, we must now determine whether credible evidence supported the commission's finding that claimant showed a change in the economic conditions under which compensation was awarded by a preponderance of the evidence. See Dublin Garment Co., 2 Va. App. at 167, 342 S.E.2d at 638 (citing Richmond Cold Storage Co., 1 Va. App. at 111, 335 S.E.2d at 850).

In this regard, we may only consider conditions that changed *after* the last award of compensation, which occurred on March 6, 2007, through the entry of the stipulated order. See Code § 65.2-101. See also Williams, 19 Va. App. at 534, 452 S.E.2d at 884; Armstrong

- 14 -

Furniture, 4 Va. App. at 244, 356 S.E.2d at 617. Much of the evidence at the hearing before the deputy commissioner focused on the decrease in claimant's profits between 1999 and 2007. While this evidence generally supports the effect claimant's injury had on his profitability, it is appropriate for us to consider only the changes in economic conditions that occurred *after* March 2007. Code § 65.2-101.

There was ample evidence to prove that in December 2007 and January and February 2008, claimant's wages decreased as a result of a job for employer that took longer than expected to complete through no fault of claimant's. Claimant also testified that his profitability had decreased in recent years; specifically, he stated that he suffered decreased profits the second quarter of 2007 because of increased labor costs. These factors contributed to claimant's decision to terminate his business relationship with employer and go to work for E. F. Thompson. Because there is credible evidence in the record to support the commission's finding that an economic change occurred pursuant to Code § 65.2-101, we do not disturb this finding on appeal.

### B. Marketing of Residual Work Capacity

Employer also contends that the commission erred when it determined that claimant had made reasonable efforts to market his residual work capacity for the period of time between January 1, 2008, and February 18, 2008. Employer argues, citing Ford Motor Co. v. Favinger, 275 Va. 83, 654 S.E.2d 575 (2008), that because claimant only contacted nine potential employers during that time period, he failed to make a reasonable effort to market his remaining work capacity.

Code § 65.2-502(A) requires an employer to pay to an employee with partial incapacity for work caused by a compensable injury "a weekly compensation equal to 66 2/3 percent of the difference between his average weekly wages before the injury and the average weekly wages

which he is able to earn thereafter." "A partially disabled employee who refuses 'employment procured for him suitable to his capacity' loses entitlement to certain benefits 'during the continuance of such refusal, unless in the opinion of the Commission such refusal was justified.'" Favinger, 275 Va. at 89, 654 S.E.2d at 578 (quoting Code § 65.2-510; citing Washington Metro. Area Transit Auth. v. Harrison, 228 Va. 598, 601, 324 S.E.2d 654, 656 (1985)).

In order to obtain an award of temporary partial disability benefits, a partially incapacitated employee bears the burden of proving that he has made a reasonable effort to market his remaining capacity for work. Id. (citing Harrison, 228 Va. at 601, 324 S.E.2d at 656; White v. Redman Corp., 41 Va. App. 287, 292, 584 S.E.2d 462, 464 (2003); Holly Farms Foods, Inc. v. Carter, 15 Va. App. 29, 42, 422 S.E.2d 165, 171 (1992); Manis Constr. Co. v. Arellano, 13 Va. App. 292, 294, 411 S.E.2d 233, 234 (1991); Nat'l Linen Serv. v. McGuinn, 8 Va. App. 267, 270, 380 S.E.2d 31, 33 (1989)). "There are no fixed guidelines for determining what constitutes a 'reasonable effort' by an employee to market residual work capacity." Favinger, 275 Va. at 89, 654 S.E.2d at 579 (quoting Great Atl. & Pac. Tea Co. v. Bateman, 4 Va. App. 459, 467, 359 S.E.2d 98, 102 (1987)). Consequently, "[w]hat constitutes a reasonable marketing effort depends upon the facts and circumstances of each case." Greif Cos. v. Sipe, 16 Va. App. 709, 715, 434 S.E.2d 314, 318 (1993).

In several contexts, this Court has provided an analytical framework to determine what criteria should be considered when determining the reasonableness of an employee's effort:

> "(1) the nature and extent of [the] employee's disability; (2) the employee's training, age, experience, and education; (3) the nature and extent of [the] employee's job search; (4) the employee's intent in conducting his job search; (5) the availability of jobs in the area suitable for the employee, considering his disability; and (6) any other matter affecting [the] employee's capacity to find suitable employment."

- 16 -

Favinger, 275 Va. at 90, 654 S.E.2d at 579 (quoting Nat'l Linen Serv., 8 Va. App. at 272, 380 S.E.2d at 34 (footnotes omitted)). Accord Metro. Washington Airports Auth. v. Lusby, 41 Va. App. 300, 317, 585 S.E.2d 318, 326 (2003); Wall St. Deli, Inc. v. O'Brien, 32 Va. App. 217, 220, 527 S.E.2d 451, 453 (2000). Essentially, a claimant "'must present some evidence that he [has] engaged in a *good faith* effort to obtain work within the tolerance of his physical condition,'" and he has failed to find a market for his residual work capacity, "'either due to his injury or because no such work was available in the community.'" Favinger, 275 Va. at 90, 654 S.E.2d at 579 (quoting Nat'l Linen Serv., 8 Va. App. at 271, 380 S.E.2d at 34).

In the instant case, the commission made the following critical determination regarding claimant's marketing of his residual work capacity:

> [B]ased on the claimant's age, education, training and experience, as well as the nature of his disability and availability of jobs, the claimant made a reasonable effort in contacting nine different trucking companies, one of which hired him. It is particularly inappropriate for the employer to pick at the claimant's marketing efforts considering that he was actually successful in obtaining steady employment without the seasonal fluctuations of his pre-injury job. This search took place while the claimant continued to maintain a business of his own. We agree with the Deputy Commissioner that the claimant has credibly and reasonably maximized his earnings.

The commission's findings are supported by credible evidence, including claimant's testimony, financial records, and list of job contacts. As fact finder, the commission could reasonably conclude that claimant's contact with 9 employers over the 7 weeks spanning January 1, 2008, and February 18, 2008, was realistic in light of claimant's age, education, training, and experience, as well as the nature of his disability and availability of jobs in the shipping industry. As fact finder, the commission was entitled to conclude that claimant's contact of only 9 employers in 7 weeks was not fatal to his case. The law requires only a reasonable marketing effort, not a successful effort, or the most efficient or best effort.

- 17 -

Furthermore, given the unique facts and circumstances of this case, there was credible evidence to support the commission's conclusion that claimant's failure to seek additional employment after he accepted the position with E. F. Thompson on March 15, 2008, was reasonable. The commission did not (nor was it required to) specifically articulate its rationale for finding claimant's post-March 15, 2008 marketing reasonable; it merely affirmed the deputy commissioner's determinations. In this regard, Deputy Commissioner Colville held:

> once the claimant commenced employment with E. F. Thompson, we find his weekly wage loss is properly attributable to the effects of the accident and not because of the whims of the moving business. The delivery of mail for the post office would not have such cyclical changes and he has the same 70 hours per week limits as he did with his own business.

In considering the commission's decision, we may not "retry the facts, reweigh the preponderance of the evidence, or make [our] determination of the credibility of the witnesses." Wagner Enters, Inc., 12 Va. App. at 894, 407 S.E.2d at 35 (citing Jules Hairstylists, Inc. v. Galanes, 1 Va. App. 64, 69, 334 S.E.2d 592, 595 (1985)). If credible evidence supports the commission's finding, we must uphold it. Dublin Garment Co., 2 Va. App. at 167, 342 S.E.2d at 638 (citing Richmond Cold Storage Co., 1 Va. App. at 111, 335 S.E.2d at 850).

Employer argues that claimant failed to reasonably market his residual work capacity after accepting employment with E. F. Thompson. In support of its argument, employer states that during the weeks that claimant earned less than his pre-injury average weekly wage, he was obligated to take some action to mitigate the wage loss pursuant to Favinger, 275 Va. 83, 654 S.E.2d 575. In Favinger, the evidence established that Favinger routinely worked 50-hour weeks at Ford prior to his injury. 275 Va. at 91, 654 S.E.2d at 579. After his injury, Favinger claimed "a wage loss for the overtime that he did not receive during certain weeks while performing his light duty job." Id. During the weeks that he did not work overtime with Ford, Favinger did not seek employment elsewhere to supplement his income. Id. at 90, 654 S.E.2d at 579. The

commission found that it "was 'unreasonable to expect' Favinger to market his residual capacity beyond his 40-hour work week at Ford and that, if he did so, such overtime work 'would likely interfere with any overtime which might become available' at Ford." Id.

The Supreme Court found that the commission's decision that Favinger had reasonably marketed his residual work capacity was not supported by the evidence, as there was no evidence "that Favinger actually attempted to market his residual work capacity and that available jobs within his capacity would have interfered with his duties at Ford, including his ability to accept overtime work offered by Ford." Id. at 90-91, 654 S.E.2d at 579.

*Favinger is distinguishable from the instant case in several significant respects.* Significantly, Favinger worked in a Ford body shop prior to his injury, and after his injury, he performed light-duty work in an office setting and in the body shop. Id. at 86, 654 S.E.2d at 576. Moreover, Favinger worked a standard 40-hour week, with 10 hours of overtime. Id. at 91, 654 S.E.2d at 579. The uncontroverted evidence in the instant case is that claimant testified that he worked approximately the same amount of hours post-injury that he worked pre-injury; however, his post-injury work was less lucrative, resulting in a smaller average weekly wage. From this record, there is no basis to conclude that claimant somehow failed to market all of his residual overtime capacity in terms of whether he was working an appropriate number of hours—there was credible evidence that he was.

More precisely, our inquiry must address whether there is credible evidence that claimant's work with E. F. Thompson was "not suitable to his capacity." Code § 65.2-510. The commission restated the deputy commissioner's finding that claimant's "effort to seek employment as a truck driver [was] a reasonable effort given his background, experience, education, and level of disability." Both the deputy commissioner and the commission recognized the cyclical nature of the moving industry. The commission had previously chastised

claimant for having employment that was susceptible to a fluctuating business cycle.  To this end, the commission considered claimant's employment with E. F. Thompson to be reasonable in light of E. F. Thompson's ability to provide claimant with a steadier income.  The deputy commissioner also found that E. F. Thompson provided a "relatively high income," presumably in comparison with other potential employers.  Notably, claimant's average weekly wage with E. F. Thompson was approximately $150 more than he earned on average the last year he worked with employer.

Finally, claimant testified that he had no set schedule with E. F. Thompson and did not know the hours he was working until he called in each day; therefore, any additional employment would interfere with his job with E. F. Thompson.  Claimant testified that if he worked for anyone else, those hours would be considered in calculating whether he worked over 70 hours per week in contravention of the state regulations.  Accordingly, accepting work with another company could potentially impact his regular work with E. F. Thompson.  Given the unique facts and circumstances presented in the record, the instant case is distinguishable from Favinger.

Accordingly, because the commission's findings are supported by credible evidence, we will not disturb them on appeal.

### C.  Disability

Finally, employer argues that the commission erred when it determined that claimant was disabled as a result of his work injury.  Specifically, employer alleges that claimant failed to present credible evidence that he was disabled as a result of his work injury.  Employer argues that claimant's medical records, which were two and one half years old at the time of the hearing, were stale and could not be considered to establish claimant's disability.

- 20 -

"'[A] party seeking [workers'] compensation bears the burden of proving his disability and the periods of that disability.'" Hoffman v. Carter, 50 Va. App. 199, 216, 648 S.E.2d 318, 327 (2007) (quoting Marshall Erdman & Assocs. v. Loehr, 24 Va. App. 670, 679, 485 S.E.2d 145, 149-50 (1997)). Moreover, "'[t]here is no presumption in the law that once a disability has been established, a claimant will be assumed to remain disabled for an indefinite period of time.'" Id. (quoting Loehr, 24 Va. App. at 679, 485 S.E.2d at 149). Whether claimant suffered from a continuing disability is a question of fact. Id. (citing Loehr, 24 Va. App. at 679, 485 S.E.2d at 149). Accordingly, we must give deference to any findings of fact made by the commission in awarding temporary partial disability if those findings are supported by credible evidence in the record, regardless of whether contrary evidence exists or contrary inferences may be drawn. See Dublin Garment Co., 2 Va. App. at 167, 342 S.E.2d at 638.

For claimant to succeed on appeal, credible evidence supporting the commission's finding of temporary partial disability must be present in the appellate record. In determining that claimant was partially disabled, the commission placed great weight on medical evidence. It noted that "the medical records establish that the claimant's treating surgeon has imposed permanent restrictions on lifting and duration of driving." In this regard, in October 2006, Dr. Hughes opined that claimant had "reached maximum medical improvement." Dr. Hughes stated that no further diagnostic or treatment options would be "pursued as they are unlikely to alter ultimate outcome or be health beneficial." The doctor authorized permanent work restrictions of no pushing and pulling, no lifting more than 30 pounds, and no driving more than 2 hours, and he ordered claimant to wear an ankle brace. Claimant also testified that Dr. Hughes had treated him shortly before the hearing before the deputy commissioner. He stated that Dr. Hughes prescribed pain medication and 4 weeks of physical therapy.

Additionally, claimant testified that he suffered from chronic back pain and continued to be treated by physicians after his compensable injury. He testified that he could not lift heavy objects, had difficult loading and unloading shipments, and could no longer drive for long periods of time.

Accordingly, there is credible evidence to support the commission's finding that claimant suffered from a continuing disability. The commission may consider a claimant's testimony in conjunction with medical records in making factual findings. See Dollar Gen. Store v. Cridlin, 22 Va. App. 171, 176, 468 S.E.2d 152, 154 (1996). Also, "'[m]edical evidence is not necessarily conclusive, but is subject to the commission's consideration and weighing.'" Id. (quoting Hungerford Mech. Corp. v. Hobson, 11 Va. App. 675, 677, 401 S.E.2d 213, 215 (1991)). Claimant's testimony supported the finding that he continued to suffer from a partial disability, and Dr. Hughes' 2006 opinion that claimant's injury was permanent, as well as his prescription of pain medication and physical therapy in 2009 provided additional credible evidence supporting the commission's finding. Although there was no recent medical report submitted for consideration, there was other credible evidence to support the commission's finding of partial disability.

## III. CONCLUSION

For the reasons stated, we affirm the commission's determination that claimant was entitled to file for temporary partial disability benefits pursuant to Code § 65.2-708. We also affirm the commission's findings that claimant made reasonable efforts to market his residual capacity and that he suffered from a continuing partial disability.

Affirmed.